Shelly Raithel HAMPTON, Appellant,

v.

James M. JECMAN, D.D.S.,
et al, Respondent.

No. WD 57620.

Missouri Court of Appeals,
Western District.

June 5, 2001.

Motion for Rehearing and/or Transfer to Supreme Court Denied July 3, 2001.

Application for Transfer Denied
Aug. 21, 2001.

---

G. Spencer Miller, Gladstone, for appellant.

Susan Ford Robertson, Columbia, for respondent.

RONALD R. HOLLIGER, Presiding Judge.

Shelly Hampton appeals from the judgment entered by Judge Thomas Brown in Cole County Circuit Court following a jury verdict in favor of James M. Jecman, D.D.S. She claims the trial court erred in refusing to submit to the jury her proffered verdict directing instruction, which included an alternative disjunctive submission that Jecman failed to advise her that his proposed treatment plan included treatment that was not commonly used by dentists. She claims there was substantial evidence to support the alternative submission of negligence refused by the trial court.

## FACTS and PROCEDURAL HISTORY

In late 1989, Shelly Hampton was experiencing migraine headaches and pain in her jaw. Her family dentist advised her to see an orthodontist. On November 7, 1989, Ms. Hampton consulted with James M. Jecman, a Jefferson City dentist who advertised as treating for "TMJ care" and "braces." At that time, Ms. Hampton was experiencing difficulty in opening her mouth. She had no complaints about the cosmetic appearance of her teeth. Dr. Jecman diagnosed her as suffering from temporomandibular joint (TMJ) disease. TMJ disease is a condition related to the alignment of the joints, muscles, and bite of the jaw, and which may cause pain in the facial muscles and joints, head and earaches, and a click or pop when the jaw is used.

Dr. Jecman was also of the opinion that Ms. Hampton's lower jaw fit too far up and was compressed backwards, as was the upper jaw. Dr. Jecman, at the time of consultation, was not certified as an orthodontist, nor was he a doctor of medicine or chiropractic.

Dr. Jecman included in his practice a treatment modality referred to as "craniosacral therapy," also known as cranial manipulation. Explaining the treatment, Dr. Jecman testified that the bones in the skull are tied to the spinal cord, which affects the entire body, and that some misalignment of those bones might affect one's health. Dr. Jecman also testified that making some adjustments to the structure of the skull can affect certain ailments, including colic, ear infections, cerebral palsy, autism, temporomandibular joint problems, nosebleeds, epilepsy, Meniere's Syndrome, Bell's Palsy, stomach problems, knee and back problems, learning disabilities, and attention deficit disorders. At trial, Dr. Jecman admitted that there is no recognized dental specialty board relating to cranial manipulation or craniosacral therapy. Both Dr. Jecman and his expert witness testified that craniosacral therapy is not a treatment commonly used by dentists. Dr. Jecman's treatment plan also included a modality involving movement and adjustment of Ms. Hampton's teeth using orthodontic appliances, including braces.

Dr. Jecman saw Ms. Hampton again on December 12, 1989, for an evaluation. Her mother accompanied her. Dr. Jecman testified that he had asked Ms. Hampton to bring her mother to that appointment so he could explain to both of them the risks and complications of his proposed treatment of her. Dr. Jecman read to the jury from his notes, that he had "a comprehensive consult" with Ms. Hampton and her mother "concerning right side bend rotation and collapse of the ear canal," "how it affects the body, the neck, the face, and how [he] had to treat them," and that the problems "could include [a] lack of ideal correction," especial-

ly given her age and that she was no longer a growing child. Dr. Jecman claims that he advised Ms. Hampton that craniosacral therapy is not widely practiced by dentists, and that it is not a common practice. Ms. Hampton denied that he advised her that the modality was not commonly used. Dr. Jecman's office records do not indicate that he made Ms. Hampton aware that craniosacral therapy is not a common practice among dentists. Ms. Hampton also claims that Dr. Jecman did not advise her that moving her teeth around could cause the roots of her teeth to be damaged or reabsorbed, nor that the proposed treatment could make her look cosmetically worse.

During Ms. Hampton's first treatment with Dr. Jecman, on December 12, 1989, he sought to treat her headaches and TMJ problem. His treatment included palpation of her skull, neck, spine, pelvis, shoulder blades, and lower left leg and feet. He estimated that Ms. Hampton's treatment would take approximately 30 to 36 months. Ms. Hampton testified that Dr. Jecman's treatment of her over the next three years routinely included manipulation of her skull, neck, chest, shoulder, collarbone and sacroiliac joints.

In 1990, Dr. Jecman first applied braces to Ms. Hampton's teeth. Ms. Hampton testified that he told her she would be out of them by the time of her wedding in October 1993; and that approximately a year before the wedding, in 1992, Dr. Jecman again assured her that the braces would be off by the wedding. In September 1993, Ms. Hampton discontinued seeing Dr. Jecman and sought care from Dr. Huber, a board certified orthodontist. Neither Ms. Hampton nor Dr. Jecman believed at that time that her treatment was complete, or that her TMJ symptoms or headaches had completely resolved. She testified that, at the time she stopped treating with Dr. Jecman, her teeth were protruding outward and did not touch, but that her condition improved under the care of Dr. Huber. She testified it was necessary for her to keep the braces on until November 5, 1998, resulting in her having them on for a total of nine years. Dr. Huber testified that he did not have a clear understanding of the treatment provided by Dr. Jecman, nor did he, for that reason, have an opinion regarding Dr. Jecman's care of Ms. Hampton.

Ms. Hampton brought suit against Dr. Jecman and his professional corporation. In her petition, she alleged various grounds of negligent care and treatment by the defendants, including failure to explain the risks associated with the cranial manipulation therapy and failure to obtain her consent to the treatment. The latter two allegations did not differentiate between the modalities of orthodontics and cranial manipulation.

At the instruction conference, Ms. Hampton's attorney proffered the following disjunctive verdict directing instruction, referred to in the record as Plaintiff's Exhibit 52, which submitted three alternative theories of failure to obtain informed consent to treatment and one theory of affirmative negligent treatment:

INSTRUCTION NO. ——

Your verdict must be for plaintiff Shelly Hampton against defendants James M. Jecman, D.D.S. and James M. Jecman, D.D.S., P.C., if you believe:

First, defendant James M. Jecman, D.D.S. either:

failed to advise plaintiff Shelly Hampton, either:

that his proposed treatment could damage the roots of her teeth, or

that his proposed treatment could make her cosmetic appearance less appealing, or

**that his proposed treatment was not commonly used by dentists** [1]

excessively moved plaintiff Shelly Hampton's teeth from their original position, and

Second, defendant James M. Jecman, D.D.S., in any one or more of the respects submitted in paragraph First, was thereby negligent, and

Third, such negligence directly caused or directly contributed to cause damage to plaintiff Shelly Hampton.

The court rejected Hampton's proffered instruction. Instead, the trial court chose to submit to the jury the following instruction which is identical to that offered by Ms. Hampton, except that it does not include the third disjunctive phrase in paragraph First, "that his proposed treatment was not commonly used by dentists":

### INSTRUCTION NO. 9

Your verdict must be for plaintiff Shelly Hampton against defendants James M. Jecman, D.D.S. and James M. Jecman, D.D.S., P.C., if you believe:

First, defendant James M. Jecman, D.D.S. either:

failed to advise plaintiff Shelly Hampton, either:

that this proposed treatment could damage the roots of her teeth, or

that his proposed treatment could make her cosmetic appearance less appealing, or

excessively moved plaintiff Shelly Hampton's teeth from their original position, and

Second, defendant James M. Jecman, D.D.S., in any one or more of the respects submitted in paragraph First, was thereby negligent, and

Third, such negligence directly caused or directly contributed to cause damage to plaintiff Shelly Hampton.

The jury returned a verdict in favor of Dr. Jecman. This appeal follows.

### STANDARD OF REVIEW

■ A trial court's refusal to submit an instruction to the jury is reviewed for an abuse of discretion. *Quinn v. Lenau,* 996 S.W.2d 564, 569 (Mo.App.1999). In considering the propriety of a proffered instruction, we view the evidence in the light most favorable to the submission of the instruction, keeping in mind that a party is entitled to an instruction on any theory supported by the evidence. *Kauzlarich v. Atchison, Topeka, and Santa Fe Ry. Co.,* 910 S.W.2d 254, 258 (Mo. banc 1995); *Shop 'N Save Warehouse Foods, Inc. v. Soffer,* 918 S.W.2d 851, 862 (Mo. App.1996). Where an instruction is given in the disjunctive, each alternative submitted in the instruction must be supported by evidence. *Ladish v. Gordon,* 879 S.W.2d 623, 628 (Mo.App.1994). If each allegation presented in the instruction is not supported by the evidence, the giving of the instruction is error. *Id.* Therefore, if there is substantial evidence to support an instruction or an alternative theory of negligence, the refusal to submit that instruction is error. *Naes v. Reinhold Dev. Co.,* 950 S.W.2d 681, 683 (Mo.App.1997). The error in refusing to give an instruction is reversible error, however, only if it was prejudicial. *Higby v. Wein,* 996 S.W.2d 95, 97 (Mo.App.1999).

---

1. The word "or" was missing from the rejected instruction as a result of a typographical error. It is clear from the instruction conferring ence that this was not the reason for the trial court's refusal to give Ms. Hampton's proposed version of the verdict director.

## DISCUSSION

■ In her sole point on appeal, Ms. Hampton claims the trial court erred in refusing her proffered verdict directing instruction. She argues that the instruction she proposed should have been submitted to the jury because the evidence supported it. Ms. Hampton claims that the jury, based on the evidence, could reasonably have determined that a reasonable person in her position would have refused to consent to the treatment proposed by Dr. Jecman.

■ Ms. Hampton argues, correctly, that Missouri has long recognized a plaintiff's cause of action against a medical provider for negligently failing to inform the patient:

> The basic philosophy in malpractice cases is that the doctor is negligent by reason of the fact that he has failed to adhere to a standard of reasonable medical care, and that consequently the service rendered was substandard and negligent. In our judgment, this is true whether the alleged malpractice consists of improper care and treatment (the usual malpractice case) or whether it is based, as here, on an alleged failure to inform the patient sufficiently to enable him to make a judgment and give an informed consent if he concludes to accept the recommended treatment.

*Aiken v. Clary*, 396 S.W.2d 668, 673 (Mo. 1965).

■ Some basic review of the foundation requirements of a medical negligence action may be helpful in understanding our analysis of the testimony in this case, and our disposition based on that evidence. Liability of a health care provider in a negligence case depends, as in other tort cases, upon proof establishing a duty, breach of that duty, and resultant damages. The duty of the provider is to use that degree of skill and learning ordinarily used under the same or similar circumstances by the members of defendant's profession. MAI 11.06 (1990 Revision)[1991].

■ In the context of an uninformed consent medical provider negligence case, expert opinion testimony is generally required to establish what disclosures are required to be made to the patient in accordance with the standard described in MAI 11.06. Whether the required disclosure has or has not been made is generally a question of fact for resolution by the jury that does not require or even lend itself to expert testimony. *Steele* at 199. The genesis of the informed consent theory is to enable a patient to informedly decide both whether the proposed treatment is justified in light of the risks disclosed and whether the patient has received sufficient information to make an informed decision between different treatment modalities. Contrary to some popular misconception this does not require proof or submission to the jury of whether the patient would have refused to consent to treatment. *Wilkerson v. Mid-America Cardiology*, 908 S.W.2d 691, 696–97 (Mo.App.1995).

■ To prove a medical provider is negligent by failing to obtain informed consent, a plaintiff must present evidence of: (1) nondisclosure; (2) causation; and (3) injury. *Id.* Dr. Jecman argues initially that the evidence did not support Ms. Hampton's refused informed consent alternative. Alternatively, he argues that the proposed submission constituted a roving commission.

Ms. Hampton argues in her reply brief that we cannot consider any reasons proferred by Dr. Jecman to support the trial court's refusal to give her instruction because Rule 70.03 required Dr. Jecman to object to the instruction at trial. Ms.

Hampton points out that Dr. Jecman did not object to the refused instruction at trial. Rule 70.03 provides:

Counsel shall make specific objections to instructions considered erroneous. No party may assign as error the giving or failure to give instructions unless that party objects thereto before the jury retires to consider its verdict, stating distinctly the matter objected to and the grounds of the objection. Counsel need not repeat objections already made on the record prior to the delivery of the instructions. The objections must alos be raised in the motion for new trial in accordance with Rule 78.07

Ms. Hampton's argument misintreprets Rule 70.03. The rule as amended in 1994 was intended to give the trial court notice of any claimed defect or problem with the instructions it planned to give to the jury so that it could consider the claim and, if necessary, correct any defect before submission. The new requirement to make specific objections was given teeth by the rule's provision prohibiting the raising of a claim of instructional error on appeal that had not been presented to the trial court before submission to the jury. Rule 70.03, as amended, therefore expanded the concept of preservation of error, as a prequisite to appellate review, to include the instruction conference as well as the post-trial motion. The duty imposed by Rule 70.03 requires notice to the trial court that a party believes that an instruction planned to be given should not be used, or conversely that a party believes that the planned instructions do not include an instruction that should be given or that a party desires to be given. Although certainly the parties should freely and candidly discuss with the court before the formal record instruction conference what instructions the parties believe should or should not be given and the reasons for those beliefs the Rule 70.03 duty does not arise

until the trial court has determined and identified which instructions it intends to give. Only then is a party required by Rule 70.03 to object to an instruction to be given or to request an instruction that it believes should be given whether in lieu of or in addition to the instructions identified by the trial court. The clear language of Rule 70.03 is to require objection to the "giving" or "failure to give" (i.e., refusal of) an instruction. Ms. Hampton's argument further ignores that Rule 70.03 enforces its requirement of objection to or tender of an instruction desired by prohibiting assignment of error on appeal. Here Dr. Jecman does not assign any error but rather argues that the trial court correctly refused the instruction. His right to argue in support of the trial court's action is not dependent upon an objection by him at the instruction conference to an instruction the trial court was not planning to give.

As to the issue of evidentiary support for the submission, Dr. Jecman argues that Ms. Hampton offered no expert testimony that dentists did not commonly use his method of orthodontic treatment. Ms. Hampton does not contest this assertion. She contends that the allegation referring to treatment not commonly used by dentists refers not to the orthodontic treatment, but to the modality of craniosacral manipulation. Nevertheless, claims Dr. Jecman, there was also no expert testimony to support submission under that theory. The gist of Dr. Jecman's argument seems to be that such a theory cannot be submitted without expert testimony (1) regarding craniosacral manipulation, (2) risks associated with craniosacral manipulation, or (3) risks created because craniosacral manipulation was not commonly used by dentists. We believe that Dr. Jecman too narrowly limits the doctrine of informed consent. Nevertheless, we find

that the trial court did not err and that the judgment should be affirmed.

Dr. Jecman ignores the testimony given by himself and experts who appeared on his behalf, and he points to no authority which holds that the standard of care can be established only through plaintiff's expert. Ms. Hampton responds that she has found no Missouri cases on point but discusses extensively cases from other jurisdictions holding contrary to Dr. Jecman's argument. Not only do we disagree with the doctor's position, we find that there is substantial authority in Missouri case law that testimony need not be presented exclusively, or even at all, by the plaintiff's own experts. In *Steele v. Woods,* 327 S.W.2d 187, 199 (Mo.1959), the court said that "expert testimony is not required in order to establish whether or not a doctor has complied with his duty to communicate the advice of a treatment, admittedly necessary, under a given state of facts." In *Bateman v. Rosenberg,* 525 S.W.2d 753, 757 (Mo.App.1975), the court said, "defendant's own testimony may be taken as establishing the standard of care required." (Citing *Richeson v. Roebber,* 349 Mo. 132, 159 S.W.2d 658 (1941)). Then in *Delisi* at 173–74 we held that the standard of care was established by the defendant's own testimony—including deposition excerpts—even though the plaintiff presented no expert witness. And, finally, in *Ladish v. Gordon,* 879 S.W.2d 623, 635 (Mo. App.1994), we held that a submissible case was made on one of several alternative theories of negligence where, even though the plaintiff's expert testimony fell short, the deficiency was satisfied by defendant's own expert.

■ In a situation in which the claim is a failure to disclose a certain risk, there would be no actionable tort, for example, under an informed consent theory[2] if the damage resulted from another risk that was in fact disclosed. Dr. Jecman, however, too narrowly restricts the informed consent doctrine by arguing that there must be expert testimony as to a particular risk created merely because a proposed treatment modality is not, as in this case, allegedly commonly used by dentists. The purpose of the informed consent doctrine is to allow the patient to make a reasoned and informed decision whether to incur certain risks of a treatment or to choose one treatment modality over another, or even none at all. It seems logical and consistent with that purpose that the patient would want to know and should know whether a proposed treatment is, for example, rare, experimental, or (we will assume for our analysis here) not commonly used by dentists. The patient may well decide not to undergo such a treatment, even though no express risk may accompany (or even be yet medically known) with such a procedure.

Both defendant and his expert witness, Dr. Viteas, D.D.S., testified that a careful and prudent dentist should advise a prospective patient that the treatment he is proposing is not commonly followed by dentists because that patient might want to get a second opinion. Dr. Viteas agreed that a dentist's failure to advise a patient of the risks of a particular procedure falls below the applicable standard of care. There may be no specifically known risks of such a treatment that require disclosure. However, there may be unknown or unforeseeable risks associated with an experimental or uncommon treatment. We see no reason why the doctrine of informed consent would not logically apply

**2.** Of course, there might be liability under some other theory, including negligent performance of the procedure, for example.

to injuries that occur from such risks when the unusualness of such a treatment has not been disclosed.

Nevertheless, recovery for failure to disclose information under the informed consent doctrine still requires some resultant damage. Absent any consent whatsoever (a technical "battery"), there must be some evidence of damage arising from the breach of duty (failure to disclose information required by the standard of care). Even if health care providers make inadequate or even no disclosures of potential risks of alternative treatments, there is no completed and actionable tort (other than battery in the absence of *any* consent) without resultant damage.

Plaintiff's theory is not actionable and submissible unless there is some damage resulting from the particular treatment modality, i.e ., craniosacral manipulation. There was no such evidence here. There was substantial evidence to support a claim that Ms. Hampton's teeth roots may have been damaged, or her cosmetic appearance made less appealing. The testimony, however, exclusively ties these consequences to the orthodontic treatment. We have found no testimony opining or even suggesting that the claimed damage to her teeth and appearance were caused by the cranial sacral manipulation. Although it is unclear from the evidence whether part of her damage claim included her continuing headaches, there again is no causal testimony relating that condition to the craniosacral manipulation. Nor is there even any testimony indicating that the craniosacral treatment was responsible for the fact that this condition was only alleviated and not cured by the treatment.

We do not need to consider Dr. Jecman's second argument that the rejected submission was a roving commission. We do observe that the use of the term "proposed treatment" is arguably too vague and non-specific where alleged non-disclosures relate to more than one treatment modality.

The judgment is affirmed.

HAROLD L. LOWENSTEIN, Judge, and THOMAS H. NEWTON, Judge, concur.