James E. MAST, Jr., et al., Appellants,

v.

SURGICAL SERVICES OF SEDALIA, L.L.C., et al.; Stuart J. Braverman, M.D.; David H. Wuellner; and Sedalia Internal Medicine Specialists, P.C., Respondents.

No. WD 60014.

Missouri Court of Appeals, Western District.

March 28, 2003.

Motion for Rehearing and/or Transfer to Supreme Court Denied April 24, 2003.

Application for Transfer Denied July 1, 2003.

Connie J. Clark, Osage Beach, MO, for Appellants.

D. Bruce Keplinger, Overland Park, KS, for respondents, Surgical Services of Sedalia, L.L.C. and Stuart J. Braverman.

John L. Roark, Columbia, MO, for respondents, Sedalia Internal Medicine Specialists, P.C., and David H. Wuellner.

Before JOSEPH M. ELLIS, Chief Judge, HAROLD L. LOWENSTEIN, ROBERT G. ULRICH, PATRICIA A. BRECKENRIDGE, PAUL M. SPINDEN, JAMES M. SMART, JR., EDWIN H. SMITH, VICTOR C. HOWARD, THOMAS H. NEWTON, RONALD R. HOLLIGER, and LISA WHITE HARDWICK, Judges.

THOMAS H. NEWTON, Judge.

## I. FACTUAL AND PROCEDURAL BACKGROUND

In June 1997, Mrs. Shirley Mast was suffering from gastroesophageal reflux disease. Dr. Stuart Braverman was treating her and eventually performed a fundoplication surgery. In the two weeks following this surgery, Dr. Braverman performed two additional surgeries on Mrs. Mast in order to rectify complications that were seemingly a result of the initial surgery. After her third surgery, Dr. David Wuellner met with Mrs. Mast at Dr. Braverman's request for a consultation to evaluate and assist in her treatment. Mrs. Mast was then discharged from the hospital on August 7, 1997.

Further complications arose, and Mrs. Mast developed some abscesses. Mrs. Mast was hospitalized for this condition, and during this visit she was placed on total perineal nutrition (TPN), a means of delivering life-sustaining nutrition intravenously. On October 2, 1997, Mrs. Mast was again released from the hospital.

Following this hospitalization, Mrs. Mast experienced significant weight loss, losing fifty-three pounds between mid-October and December 12, 1997. In order to address her sudden weight loss, Dr. Braverman ordered that a barium swallow test and an endoscopy be performed on Mrs. Mast in January of 1998.

Because of her continued sickness, Dr. Braverman recommended that Mrs. Mast be evaluated at the University of Missouri Health Center on March 18, 1998. Mrs. Mast followed this recommendation and was subsequently hospitalized at the University Hospital on April 9, 1998, where she was once again placed on TPN.

On May 6, 1998, Mrs. Mast died at the hospital from medical complications. Appellants James E. Mast, husband, and the Estate of Shirley Mast, filed a petition

seeking recovery for the wrongful death of Shirley Mast based upon the alleged medical negligence of respondents Stuart J. Braverman, M.D., Dr. Braverman's employer (Surgical Services of Sedalia, L.L.C.), David H. Wuellner, M.D., and Dr. Wuellner's employer (Sedalia Internal Medicine Specialists, P.C.). This petition alleged a cause of action for Shirley Mast's wrongful death and a claim by Mr. Mast for loss of consortium. This matter was tried by jury in the circuit court of Cooper County before the Honorable Ellen S. Roper. During the trial, Dr. Glennon Schaefer testified, offering the sole expert medical testimony in support of plaintiffs'/appellants' lawsuit. While testifying, Dr. Schaefer discussed Mrs. Mast's medical history and the events that occurred preceding her death. In preparation for testifying, Dr. Schaefer reviewed the medical records, which had been compiled during the course of Mrs. Mast's care. Dr. Schaefer testified that, based on his expert opinion, he believed that Mrs. Mast died as a result of malnourishment and that her death was caused by the medical negligence of Dr. Braverman and Dr. Wuellner. Dr. Schaefer stated that had Mrs. Mast been properly diagnosed as being malnourished, and then properly treated for this condition, she would not have died.

During his testimony, Dr. Schaefer discussed various types of treatment, which could have been used to insure Mrs. Mast was receiving adequate nourishment. One such method is total perineal nutrition ("TPN"). TPN, as mentioned earlier, nourishes the body by delivering nutrients intravenously. Other means of delivering nutrition, spoken of by Dr. Schaefer, are through an epigastrostomy tube (G tube) and a jejunostomy tube. The tube places food directly into the patient's stomach, where the patient then digests the food. This process, called enteral feeding, is preferable, Dr. Schaefer testified, because it is more natural and makes it possible for the patient to consume a wider variety of nutrients.

Additionally, Dr. Schaefer pointed to specific notations in Mrs. Mast's medical records that he believed should have alerted doctors that she was in need of such treatment. Specifically, Dr. Schaefer testified that by December 12, 1997, Mrs. Mast's medical records demonstrated that she had lost fifty-three pounds over two months. Additionally, Dr. Schaefer stated that the substantial decrease in Mrs. Mast's albumin levels[1] should have also been an indicator of her serious need for additional medical treatment.

Accordingly, Dr. Schaefer stated that these aforementioned medical records should have caused an investigation as to why Mrs. Mast could not adequately nourish herself and, ultimately, should have prompted medical authorities to begin treatment for her malnourished condition. It was Dr. Schaefer's ultimate opinion that Mrs. Mast's death resulted from the failure to follow these procedures.

The trial court held its first jury instruction conference after plaintiffs rested their case in chief. At that time, plaintiffs elected to submit their case to the jury on a theory of wrongful death. During this conference, plaintiffs also submitted their proposed verdict director for respondents Dr. Braverman and Surgical Services of Sedalia, L.L.C. (marked as "A" by the court), and a proposed verdict director for Dr. Wuellner and Sedalia Internal Medical Specialists, P.C. (marked as "B" by the court). Both sets of defendants objected

---

1. Albumin is a protein manufactured by the liver, which is essential to the body's circulatory system, regulating the movement of water between tissues and the bloodstream.

to plaintiffs' proposed instructions "A" and "B."

In the alternative, plaintiffs proposed instructions "C" (relating to Dr. Braverman) and "D" (relating to Dr. Wuellner). Again, both sets of defendants objected to these alternative sets of instructions. At that time, the trial court advised plaintiffs' attorney of its concerns with both sets of instructions. In fact, during this instruction conference, the court discussed, in its estimation, the substance of the verdict director that would be appropriate for this case. However, because the case had yet to be submitted to the jury (defendants' case in chief and plaintiffs' rebuttal had not yet been heard by the court), the court reserved a final ruling on these issues until all the evidence had been heard.

On the following day, plaintiffs recalled Dr. Schaefer for rebuttal testimony. During this testimony, Dr. Schaefer once again discussed the types of treatment that were available for Mrs. Mast's condition.

Following the close of the evidence in the case, the final jury instruction conference was held. During this instruction conference, the trial court ruled that plaintiffs' proposed jury instructions "A" through "D" were all denied. Alternatively, the trial court accepted the defendants' proposed verdict directors, Number 8 (Dr. Braverman) and Number 10 (Dr. Wuellner), over plaintiffs' objections. At that time, plaintiffs did not suggest any proposed language in those instructions regarding failure to diagnose malnutrition. The case was submitted to the jury. The jury returned a verdict in favor of all the defendants and against plaintiffs.

Appellants bring six points on appeal, with each point raising a jury instruction issue. Appellants' first four points contest the trial court's refusal to submit appellants' proposed verdict directors "A" through "D." Points Five and Six argue that the trial court erred in submitting the respondents' proposed verdict directors to the jury, Numbers 8 and 10.

## II. Standard of Review

On appellate review, a trial court's refusal to submit an instruction to the jury will not be disturbed absent a showing of an abuse of discretion. *Hampton v. Jecman,* 50 S.W.3d 897, 901 (Mo. App. W.D.2001). Even where error is found in a trial court's refusal to give an instruction, it is reversible error only if the refusal was prejudicial to the complaining party. *Higby v. Wein,* 996 S.W.2d 95, 97 (Mo.App. E.D.1999).

In considering the propriety of a proffered instruction, we view the evidence in the light most favorable to the submission of the instruction, keeping in mind that a party is entitled to an instruction on any theory supported by the evidence. *Hampton,* 50 S.W.3d at 901. However, jury instructions must be supported by substantial evidence. *Deckard v. O'Reilly Auto., Inc.,* 31 S.W.3d 6, 17 (Mo.App. W.D. 2000). When an instruction provides for disjunctive alternatives, each alternative submitted must be supported by substantial evidence. *Hampton,* 50 S.W.3d at 901. If the evidence does not support each allegation presented in the instruction, the giving of the instruction is error. *Ladish v. Gordon,* 879 S.W.2d 623, 628 (Mo.App. W.D.1994).

## III. Legal Analysis

### A. Dr. Braverman, the Surgical Services of Sedalia, and Instructions "A" and "C"

In submitting their proposed jury instructions, appellants first requested that instruction "A" be submitted in regard to Dr. Braverman. After this instruction was

denied, instruction "C" was proposed as an alternative (which was also ultimately rejected by the trial court). These two jury instructions read as follows.

### Instruction No. A

Your verdict must be for plaintiff James E. Mast Jr. for the survivors of Shirley Mast, against defendants, Stuart J. Braverman and Surgical Services of Sedalia, L.L.C., if you believe:

First, Plaintiff James E. Mast Jr. was the husband of Shirley Mast, and

Second, either:

Defendant Stuart J. Braverman failed to diagnose the malnutrition of Shirley Mast, or

Defendant Stuart J. Braverman failed to treat the malnutrition of Shirley Mast, on or around December 12, 1997, and

Third, Defendant Stuart J. Braverman was thereby negligent, and

Fourth, such negligence directly caused or directly contributed to cause the death of Shirley Mast.

### Instruction No. C

Your verdict must be for plaintiff, James E. Mast Jr., for the survivors of Shirley Mast, against defendants, Stuart J. Braverman and Surgical Services of Sedalia, L.L.C., if you believe:

First, Plaintiff James E. Mast Jr. was the husband of Shirley Mast, and

Second, Defendant, Stuart J. Braverman, failed to treat the malnutrition of Shirley Mast, on or around December 12, 1997, and

Third, Defendant, Stuart J. Braverman, was thereby negligent, and

Fourth, such negligence directly caused or directly contributed to cause the death of Shirley Mast.

As one can tell, these jury instructions are virtually identical to one another, except for the fact that instruction "A" has an additional verdict director, which would have allowed the jury to find Dr. Braverman liable for failing "to diagnose the malnutrition of Shirley Mast." However, this distinction between instructions "A" and "C" loses its relevancy when one analyzes the substance that they share in common.

### Proposed Jury Instructions "A" and "C" Failed To Track Plaintiffs' Theory of the Case as Established At Trial, and Therefore Constituted a "Roving Commission"

Respondents contend that the trial court did not err in concluding that proposed instructions "A" and "C" were improper verdict directors because these instructions failed to track the specific evidence presented by appellants' expert witness at trial, and as such would have given the jury a "roving commission." Therefore, it is argued that submitting the instructions to the jury would have impermissibly allowed the jury to make a finding of liability against Dr. Braverman not supported by the evidence offered at trial.

A jury instruction is erroneously given if it fails to advise the jury what specific acts or omissions by the defendant would constitute the defendant being found liable. *Lush v. Woods*, 978 S.W.2d 521, 523–24 (Mo.App. W.D.1998). Moreover, these acts or omissions in the given instruction must be confined to theories developed at trial and supported by the evidence. *Id.* at 524; *Hruban v. Hickman Mills Clinic, Inc.*, 891 S.W.2d 188, 191–92 (Mo.App. W.D.1995). Giving an instruction is error if it is "too general, submitting a question to the jury in a broad, abstract way without being limited to any issues of fact or law developed in the case." *Duren v. Union Pac. R.R. Co.*, 980

S.W.2d 77, 79 (Mo.App. E.D.1998). However, a proper jury instruction need not set "forth detailed evidentiary facts in the instructions." *Id.* "Instead, a proper instruction submits only the ultimate facts, not evidentiary details, to avoid undue emphasis of certain evidence, confusion, and the danger of favoring one party over another." *Id.* (citations omitted).

Appellants rely on *Duren* in order to demonstrate that, like in that case, jury instructions "A" and "C" would not have given the jury a "roving commission." In *Duren,* plaintiff brought a Federal Employer's Liability Act claim, seeking damages for injuries suffered while working on a railroad track. *Id.* at 78. The jury found the employer liable, and awarded plaintiff $60,000. *Id.* at 79. Plaintiff appealed, asserting that the trial court erred in submitting to the jury a mitigating damages instruction because such instruction granted a roving commission to the jury since "it fail[ed] to properly confine the jury to issues that could constitute a failure to mitigate damages." *Id.* at 80. In rejecting this argument, the court held that the jury instruction in question "simply instructed the jury on the ultimate issue in the case, whether Plaintiff failed to participate in vocational rehabilitation." *Id.*

Appellants analogize their requested instructions "A" and "C" to the mitigating damage instruction in *Duren* by arguing that these verdict directors "presented the ultimate issue of the case," thereby precluding a roving commission. However, our case is distinct from *Duren*. In *Duren,* the ultimate issue, simply stated, was whether the plaintiff engaged in rehabilitation services for his injury. *Id.* If he had not, the jury was instructed to mitigate any damages awarded to him, pursuant to Missouri law. *Id.* This mitigating instruction was given to the jury by the trial

court because defendants had provided specific evidence that plaintiff had failed to engage in any rehabilitation, and then demonstrated that under Missouri law that this fact, if found to be true, should cause a reduction in any damages awarded to the plaintiff. *Id.*

Such a solid evidentiary basis was not established by appellants in this case, one that would support requested jury instructions "A" and "C." In this case, the trial court found that appellants had established only that Dr. Braverman could be found liable for failing to prescribe TPN feeding based on the fact that this treatment was the only theory of liability supported by plaintiffs' sole expert witness at trial. It goes without saying that in order for a jury to be instructed to determine whether a doctor was negligent in practicing medicine, a plaintiff must provide an expert witness who explains how the doctor unequivocally and specifically fell below the standard of care. Appellants' proposed jury instructions "A" and "C" would have directed the jury to find Dr. Braverman negligent had he "failed to treat the malnutrition of Shirley Mast." But unlike the mitigation instruction in *Duren,* where the defendant provided substantial evidence that plaintiff's failure to engage in rehabilitation exacerbated his injury, the evidence provided by appellants did not clearly demonstrate that Dr. Braverman had several methods of treatment available to choose from in treating Mrs. Mast during the time period in question. Had the trial court given the broad instruction of "failing to treat" to the jury, it would have been able to find Dr. Braverman liable for failing to give Mrs. Mast types of treatments that were not advisable to treat her malnourished condition. Accordingly, we find this case more akin to the case of *Hruban v. Hickman Mills*

*Clinic, Inc.*, 891 S.W.2d 188 (Mo.App. W.D.1995).

In *Hruban*, plaintiff brought a medical malpractice suit against a doctor for failing to properly diagnose and treat plaintiff's appendicitis. *Id.* at 189. At trial, plaintiff's proposed instruction was rejected. *Id.* at 191. This instruction, No. C, read as follows.

Your verdict must be for plaintiffs if you believe:

First, defendant failed to properly ***diagnose and treat plaintiff***, Paula Hruban's appendicitis.

Second, defendant was thereby negligent, and

Third, as a result of such negligence, plaintiffs sustained damage.

*Id.* (emphasis added).

Instead, the trial court submitted instruction No. 8, which read as follows:

Your verdict must be for plaintiff Paula D. Schultz Hruban and against defendant F. Vernon Basantz, M.D. if you believe:

First, defendant F. Vernon Basantz, M.D., ***failed to diagnose appendicitis and have an operation performed on Mrs. Hruban*** on or before September 28, 1989, and

Second, defendant F. Vernon Basantz, M.D. was thereby negligent, and

Third, as a direct result of such negligence plaintiff Paula D. Schultz Hruban sustained damage.

*Id.* (emphasis added).

This court found that the alternate jury instruction was properly given by the trial court, instead of plaintiff's requested instruction, because the later instruction followed the specific testimony of the plaintiff's expert witness. *Id.* at 192. Instead of allowing an instruction to be submitted to the jury that vaguely stated that the doctor "failed to treat" Mrs. Hruban, the trial court required that the verdict director specify one type of treatment: an appendicitis operation. In coming to this conclusion, it was held that in "a medical malpractice case, a jury instruction which tracks the plaintiffs' expert's testimony is proper in that it does not permit the jury to find for plaintiffs on facts different from those pleaded or proved." *Id.* (citing *Wilson v. Lockwood*, 711 S.W.2d 545, 553 (Mo. App. W.D.1986)). After reviewing the trial transcript, the appellate court found that plaintiff's own expert witness expressly stated in his testimony that "the only way Mrs. Hruban could have avoided complications was to have surgery on September 28, 1989." *Id.* Therefore, it was found that the trial court did not err in initially submitting the specific jury instruction because it insured that the jury did not have a roving commission to find the doctor liable for failing to prescribe treatments which were not recommended by plaintiff's expert witness. *Id.*

The issues presented in our case for review are quite similar to those presented in *Hruban*. In this appeal, it is asserted that the trial court erred in concluding that appellants' requested jury instructions were too vague, thereby allowing a roving commission. Jury instructions "A" and "C" both stated that Dr. Braverman should be found liable if he failed "to treat the malnutrition of Shirley Mast." However, like in *Hruban*, Dr. Schaefer ultimately concluded that the only proper treatment was a very specific type, known as hyperalimentation or "TPN." It is true that Dr. Schaefer testified about other various means of supplying nutrition to Mrs. Mast, such as enteral feeding through a tube. But after reviewing the trial transcript, it is apparent that Dr. Schaefer ultimately stated that only one type of treatment, TPN, would have been appropriate for Mrs. Mast's alleged condition.

It is also true, as appellants point out, that Dr. Schaefer rendered an expert opinion ultimately concluding that Dr. Braverman's failure to diagnose or treat Mrs. Mast's malnutrition was the cause of her death. This testimony was as follows.

Q: Doctor, do you have an opinion within a reasonable degree of medical certainty whether the failure of Dr. Braverman to diagnose or treat the malnutrition of Shirley Mast caused her death?

A: Yes.

Q: And what is that opinion, sir?

A: I believe it did.

However, like in *Hruban,* Dr. Schaefer then discussed at great length the types of treatment available for Mrs. Mast's condition, and in doing so, concluded that only one type of treatment would have been appropriate for Mrs. Mast's condition within a reasonable degree of medical certainty. In discussing the kind of treatments available for Mrs. Mast's condition, Dr. Schaefer spoke of two main types of treatment: TPN and enteral feeding. However, it was Dr. Schaefer's *ultimate opinion that he would have recommended TPN.* The following is illustrative of this point:

Q: What type of medical treatment might have helped Shirley at that particular stage of her recovery?

A: ... And then some intervention either the ways we talked about before with hyperalimentation, TPN into a vein *or* using your using own intestinal tract.

(emphasis added).

In this first part of his answer, Dr. Schaefer states that either TPN or enteral feeding ("using your own intestinal tract") could have been prescribed to treat Mrs. Mast. However, Dr. Schaefer immediately goes on to state, quite clearly, that it was his expert opinion that TPN was the type of treatment that should have been prescribed by Dr. Braverman:

Q: And—

A: I think most people when you lose that much weight, and you're having problems with your intestinal tract, **you're going to go directly to a hyperalimentation [TPN]** in an attempt to using the intestinal tract.

Q: And could this hyperalimentation [TPN] something that could have been done at home?

A: Yes. We do that all the time.

Q: **And would that have been what you would have recommended for Shirley's nutrition at that time period?**

A: **At that time, yes.**

Q: And to your knowledge and review of the records, did Shirley ever receive any home hyperalimentation [TPN]?

A: Not at home ...

(emphasis added).

More importantly, Dr. Schaefer testified that because of Mrs. Mast's medical condition, it was his expert opinion that TPN was the only possible form of treatment for Mrs. Mast. Typically, TPN is used when enteral feeding is not possible because a patient's digestive system is not working. And according to Dr. Schaefer, because Mrs. Mast's intestine was not working properly, TPN was the only possible form of treatment. Dr. Schaefer's testimony clearly illustrates this point:

A: ... the ideal thing is to use your own intestinal tract [enteral feeding] and to only use TPN when your own GI tract [is not working]—God gave you a better GI tract than anything we can put in your own veins.

Q: And in December 1997, Mrs. Mast's GI tract was working?

A: Apparently not. She was vomiting. She was losing weight.

* * *

Q: And when you indicate that TPN should have been used for Shirley Mast in December of 1997, it was your assumption from your review of the records that her own system was not working at the time?

A: That's correct, and that's the only reason I would say that.

At one time during his testimony, Dr. Schaefer did not rule out the possibility that enteral feeding could have been used to treat Mrs. Mast. But at no time did he recommend using this type of feeding to treat Mrs. Mast, or testify with any degree of medical certainty that enteral feeding was feasible for Mrs. Mast. Dr. Schaefer's testimony brings this point into focus:

Q: Okay. And what you think should have been done was starting the home TPN in December?

A: I think—

Q: By mid December?

A: And it *might have been* that she could have the jejunostomy tube placed at that time to feed her down her intestinal tract [enteral feeding].

(emphasis added).

It is our opinion that this testimony falls short of the requisite expert testimony necessary to establish that Dr. Braverman was liable for failing to prescribe enteral feeding or any other type of treatment besides TPN. Accordingly, it would have been error for the trial court to submit instructions "A" and "C" to the jury because doing so would have allowed a finding of liability against Dr. Braverman for failing to prescribe a treatment that appellants' own expert witness did not recommend being used to treat Mrs. Mast's alleged malnourished condition.

■ Because the thrust of Dr. Schaefer's testimony (in regard to treating Mrs. Mast's alleged malnourishment) was that she should have received TPN, appellants' requested jury instructions "A" and "C" were not proper verdict directors. As previously stated, in "a medical malpractice case, a jury instruction which tracks the plaintiffs' expert's testimony is proper in that it does not permit the jury to find for plaintiffs on facts different from those pleaded or proved." *Hruban,* 891 S.W.2d at 192. Had the verdict director in this case merely stated "failure to treat," the jury would have been able to find Dr. Braverman liable for failing to prescribe treatment procedures that, according to the plaintiffs' own expert witness, were either not advisable or not possible to treat Mrs. Mast. Accordingly, because plaintiffs' case only supported a verdict director that Dr. Braverman was negligent in failing to treat Mrs. Mast with TPN, the trial court did not err in refusing to submit jury instructions "A" and "C."

### B. Dr. Wuellner, Sedalia Internal Medicine Specialists, and Instructions "B" and "D"

Next, appellants assert that the trial court erred in refusing their proposed instructions "B" and "D." Instructions "B" and "D" were identical in substance to instructions "A" and "C," with the exception that Dr. Braverman and Surgical Services of Sedalia were substituted with Dr. Wuellner and Sedalia Internal Medicine Specialists. Instructions "B" and "D" read as follows.

### Instruction No. B

Your verdict must be for Plaintiff, James E. Mast Jr., for the survivors of Shirley Mast, against Defendants, David H. Wuellner and Sedalia Internal Medicine Specialists, P.C., if you believe:

First, Plaintiff James E. Mast Jr. was the husband of Shirley Mast, and

Second, either:

Defendant David H. Wuellner failed to diagnose the malnutrition of Shirley Mast, or

Defendant David H. Wuellner failed to treat the malnutrition of Shirley Mast, on or around December 12, 1997, and

Third, David H. Wuellner was thereby negligent, and

Fourth, such negligence directly caused or directly contributed to cause the death of Shirley Mast.

### Instruction No. D

Your verdict must be for plaintiff James E. Mast Jr. for the survivors of Shirley Mast, against defendants, David H. Wuellner and Sedalia Internal Medicine Specialists, P.C., if you believe:

First, Plaintiff James E. Mast Jr. was the husband of Shirley Mast, and

Second, Defendant David H. Wuellner failed to treat the malnutrition of Shirley Mast, on or around December 12, 1997, and

Third, David H. Wuellner was thereby negligent, and

Fourth, such negligence directly caused or directly contributed to cause the death of Shirley Mast.

### Proposed Jury Instructions "B" and "D" Failed to Track Plaintiffs' Theory of the Case as Established at Trial

Proposed instructions "B" and "D" both were improper verdict directors because each contained a clause that would have allowed the jury to assess liability against Dr. Wuellner if it was found that he "failed to treat the malnutrition of Shirley Mast." As previously discussed in the analysis of instructions "A" and "C," this clause taints the entire proposed jury instruction because it failed to track the evidence adduced in the plaintiffs' case, and therefore would have given the jury a roving commission. *See supra,* III(A). As such, the trial court did not err in refusing to give plaintiffs' proposed verdict directors "B" and "D."

### C. The Verdict Directors Submitted By The Trial Court To The Jury, Instructions No. 8 and No. 10.

After denying appellants' proposed verdict directors "A" through "D," the trial court inquired whether appellants had any other alternate jury instructions ready for submission to the court. Because appellants did not, the trial court permitted respondents to submit any proposed jury instructions. Respondents proposed instructions, labeled numbers 8 and 10, were accepted by the trial court and, ultimately, were submitted to the jury as the sole verdict directors in this case. In substance, these verdict directors mirrored each other, with No. 8 referring to Dr. Braverman and No. 10 referring to Dr. Wuellner. These instructions read as follows.

### Instruction No. 8

Your verdict must be for plaintiff James E. Mast, Jr., for the survivors of Shirley Mast, and against defendants Stuart J. Braverman, M.D., and Surgical Services of Sedalia, L.L.C., if you believe:

First, plaintiff James E. Mast, Jr., was the husband of Shirley Mast, and

Second, defendant Stuart J. Braverman, M.D., failed to prescribe home TPN for Shirley Mast on or around December 12, 1997, and

Third, Defendant Stuart J. Braverman, M.D., was thereby negligent, and

Fourth, such negligence caused or directly contributed to cause the death of Shirley Mast.

**Instruction No. 10**

Your verdict must be for plaintiff James E. Mast, Jr., for the survivors of Shirley Mast, and against defendants David H. Wuellner, M.D., and Sedalia Internal Medicine Specialists, P.C., if you believe:

First, plaintiff James E. Mast, Jr., was the husband of Shirley Mast, and

Second, defendant David H. Wuellner, M.D., failed to prescribe home TPN for Shirley Mast on or around December 12, 1997, and

Third, Defendant David H. Wuellner, M.D., was thereby negligent, and

Fourth, such negligence caused or directly contributed to cause the death of Shirley Mast.

### 1. The Trial Court Did Not Error In Submitting Verdict Directors 8 and 10

 It is the appellants' contention on appeal that "Instructions No. 8 and No. 10 incorrectly instruct[ed] the jury that failure to treat was the only issue, when obviously failure to diagnose malnutrition was also evident, and supported by Appellants' expert testimony." We hold that this point must be denied because the trial court's failure to include "failure to diagnose malnutrition" language in verdict directors 8 and 10 did not constitute error. In reviewing whether the trial court erred in submitting a verdict director, this court views the "evidence in the light most favorable to the submission of the instruction." *Hampton,* 50 S.W.3d at 901. "To obtain reversal of a jury verdict on grounds of instructional error, Appellants must show that: 1) the offending instruction misdirected, misled or confused the jury, and 2) prejudice resulted from the

error." *Holder v. Schenherr,* 55 S.W.3d 505, 507 (Mo.App. W.D.2001). Finally, the "burden of proof rests with the party alleging error." *Id.*

To repeat, it is the appellants' contention that "Instructions No. 8 and No. 10 incorrectly instruct[ed] the jury that failure to treat was the only issue, when obviously failure to diagnose malnutrition was also evident, and supported by Appellants' expert testimony." Appellants are correct that there was some testimony at trial by their expert witness, Dr. Schaefer, that Dr. Braverman failed to diagnose Mrs. Mast's alleged malnourished condition. But this fact, standing alone, does not lead this court to conclude that the trial court erred by not including "failure to diagnose malnutrition" language in jury instructions 8 and 10.

 It is true that the trial court seemingly concluded that the evidence presented at trial did not support giving a jury instruction that would have allowed the jury to find that respondents were liable for failing to diagnose malnutrition. "Any instruction submitted to a jury must be supported by substantial evidence." *Deckard,* 31 S.W.3d at 17. Moreover, "[w]hether sufficient evidence was presented to submit an issue to the jury is a legal question and not an exercise of judicial discretion." *Id.* at 18. In order to assert a successful medical malpractice claim, as a matter of law, it is incumbent upon the plaintiff to prove the following: "1) the defendant's act or omission that failed to meet the requisite medical standard of care, 2) negligent performance of that act or omission, and 3) a causal connection between the act or omission and the plaintiff's injury." *Foster v. Barnes–Jewish Hosp.,* 44 S.W.3d 432, 435 (Mo.App. E.D. 2001).[2] After reviewing the trial tran-

---

2. Actually, plaintiffs' claim against both doc-

tors was based on a wrongful death action.

script, we conclude that the evidence presented by appellants, in proving that respondents' failure to diagnose malnutrition caused Mrs. Mast's death, was less than substantial. Appellants' expert witness discussed at great length as to how the respondents' failure to *treat* Mrs. Mast's malnourished condition with TPN caused her death. However, Dr. Schaefer's testimony, as to whether the respondents' failure to diagnose her malnourishment caused her death, was confined to one interrogatory:

> Q: Doctor, do you have an opinion within a reasonable degree of medical certainty whether the failure of Dr. Braverman to diagnose *or* treat the malnutrition of Shirley Mast caused her death?
>
> A: Yes.
>
> Q: And what is your opinion, sir?
>
> A: I believe it did.

(emphasis added).

 This testimony can hardly be deemed "substantial" evidence that supports a finding of liability against respondents based on the theory that they caused Mrs. Mast's death by failing to diagnose her alleged malnourished condition. "When a party relies on expert testimony to provide evidence as to causation when there are two or more possible causes, that testimony must be given to a reasonable degree of certainty." *Super v. White*, 18 S.W.3d 511, 516 (Mo.App. W.D.2000). "When an expert merely testifies that a given action or failure to act 'might' or 'could have' yielded a given result, though other causes are possible, such testimony is devoid of evidentiary value." *Id.* Appellant's expert witness testified extensively as to how, in his expert opinion, the failure

to treat Mrs. Mast with TPN feeding caused her death. *See supra*, III(A). However, this type of detailed causation testimony was not presented for the failure to diagnose theory, that the failure to diagnose caused Mrs. Mast's death. Moreover, the above question posed to the expert witness asked this critical question of causation in a disjunctive fashion. The problem with proceeding in this manner is that it is now unclear whether Dr. Schaefer believed that it was the respondents' failure to diagnose alone, failure to treat alone, or a combination of the two, which caused Mrs. Mast's death. In order to obtain a verdict director that would allow the jury to find the respondents liable on *either* theory, it was incumbent upon appellants to prove, via substantial evidence and within a reasonable degree of medical certainty, that the respondents failure to diagnose malnutrition caused Mrs. Mast to die. This appellants simply failed to do.

The case of *Portis v. Greenhaw*, 38 S.W.3d 436 (Mo.App. W.D.2001) is illustrative of how appellants failed to make this showing. In *Portis*, decedent's family brought a wrongful death action against doctor for failure to diagnose her breast cancer. *Id.* at 441. At trial, plaintiffs' expert witness testified that "had her cancer been diagnosed in June of 1994 she would not have required high-dose chemotherapy and therefore would not have died at that time of the consequence of high-dose chemotherapy." *Id.* at 442. In reviewing appellant/defendant's claim that plaintiffs had not presented sufficient evidence to establish, as a matter of law, that the doctor's failure to diagnose the cancer caused the patient's death, this court held that the trial court's denial of the defen-

---

However, for "the appellants to succeed on their wrongful death actions against the respondents, based on their claims of medical malpractice, they [are] required to show the requisite elements of a medical malpractice claim." *Super v. White*, 18 S.W.3d 511, 515 (Mo.App. W.D.2000).

dant's motion for directed verdict was not error. *Id.* This conclusion stemmed from the fact that plaintiffs' expert testified within "a reasonable degree of medical certainty that the failure to diagnose Ms. Portis' cancer in June 1994 caused her death." *Id.*

This case is distinct from *Portis* because at no time did appellants' expert witness explain or pinpoint how respondents' failure to diagnose malnutrition resulted in Mrs. Mast's death within any degree of medical certainty. Each and every time Dr. Schaefer spoke of the cause of Mrs. Mast's death, it was his opinion that it was ultimately the failure to *treat* this malnutrition which caused her to perish. In this sense, it is clear that these issues, for the purposes of this trial, were totally interrelated. Because of this interrelation, failure to diagnose was not a separate, viable theory of recovery. It is uncertain whether appellants could have established the requisite nexus between the respondents' failure to diagnose and Mrs. Mast's subsequent death; however, it is enough to note that they did not do so. Accordingly, this case stands in stark contrast to cases such as *Portis*, where the doctor's failure to diagnose the cancerous condition was proven to have exacerbated the patient's medical condition to such a degree that the requisite chemotherapy treatment subsequently caused her death. *Id.* at 440. This causation link was established by demonstrating that, but for the doctor's failure to diagnose her cancer, Mrs. Portis would not have needed the chemotherapy that ended up taking her life. *Id.* at 442. Because appellants failed to make this showing at trial, the trial court did not err in not giving a disjunctive verdict director, which would have submitted failure to diagnose malnutrition as a separate theory of recovery. As such, the trial court did not err in submitting instructions 8 and 10.

## 2. Appellants Suffered No Prejudice From Instructions 8 and 10 Being Submitted To the Jury

■ Finally, we hold that appellants' point must be denied because, even when assuming *arguendo* that the trial court erred in refraining to include "failure to diagnose" in instructions 8 and 10, any such error was harmless. To obtain reversal of a jury verdict on grounds of instructional error, it is mandatory that appellant demonstrate prejudice stemming from the alleged error. *Holder,* 55 S.W.3d at 507. Moreover, this prejudice must be overwhelming to a degree of confusing or misleading the jury. *Wilson v. River Mkt. Venture, I.L.P,* 996 S.W.2d 687, 696–97 (Mo.App. W.D.1999). Accordingly, we conclude that, even if instructions 8 and 10 "incorrectly instruct[ed] the jury that failure to treat was the only issue, when failure to diagnose malnutrition was also evident," this error was harmless.

■ It is seemingly appellants' contention that the absence of this language from verdict directors 8 and 10 prejudiced their trial because it misled or confused the jury into believing that diagnosis of Mrs. Mast's malnourishment was not a significant issue at trial. However, there can be no other explanation why such a treatment, TPN feeding, should or would have been given to Mrs. Mast *but* to treat her alleged malnourished condition. Accordingly, when the jury read, during deliberations, instructions 8 and 10 (which stated that the respondents should be held liable if the jury found respondents negligent in failing to prescribe TPN), certainly they considered whether this treatment was necessary—necessary to treat Mrs. Mast's alleged *malnourishment.* Simply put, it is our belief that the absence of the language "failure to diagnose" in the verdict directors in this case did not work to the

prejudice of the appellants. In returning a verdict that respondents were not liable for failing to provide the only recommended treatment for Mrs. Mast's alleged malnourished condition [TPN],[3] the jury was not misled or confused by jury instructions 8 and 10 because it was plainly apparent that failure to treat with TPN was not "the only issue."

 It is critical to appreciate that the touchstone in this area of the law is whether the alleged error "confused or misled" the jury. *Id.* A proper jury instruction need not set "forth detailed evidentiary facts in the instructions." *Duren,* 980 S.W.2d at 79. Rather, the MAI contemplates that the jury will be properly advised by the argument of counsel and the trial testimony regarding factual details so that the jury will understand its instructions. *See Stone v. Duffy Distribs. Inc.,* 785 S.W.2d 671, 678 (Mo.App. S.D.1990). Accordingly, appellants have failed to demonstrate that the absence of the language "failure to diagnose" in the submitted verdict directors prejudiced the outcome of the trial. This Point is denied.

 Finally, appellants contend that the trial court erred in submitting jury instructions 8 and 10 because the "use of 'TPN' were initials and not words, and may not be understood by the jury." However, appellants can show no prejudice that stemmed from the use of the abbreviation "TPN" (in order to stand for total perineal nutrition) in jury instructions 8 and 10. Throughout the trial, this abbreviation was used before the jury. In fact, plaintiffs' own expert witness used the term "TPN" interchangeably with the term hyperalimentation. Moreover, the trial record demonstrates that after plaintiffs objected to instructions 8 and 10, the trial court ruled that they would be permitted to explain the meaning of "TPN" to the jury in closing arguments. Accordingly, the submission of instructions 8 and 10 was not error.

## IV. Conclusion

Based on our review of the record, we cannot conclude that the trial court abused its discretion in ruling on the jury instruction issues in this case. We affirm the trial court's judgment.

HAROLD L. LOWENSTEIN, Presiding Judge, and Judges, ROBERT G. ULRICH, PAUL M. SPINDEN, JAMES M. SMART, VICTOR C. HOWARD, and LISA WHITE HARDWICK concur.

RONALD R. HOLLIGER, Judge, writes for the dissent.

Judges PATRICIA A. BRECKENRIDGE, EDWIN H. SMITH, and JOSEPH M. ELLIS, Chief Judge, concur.

RONALD R. HOLLIGER, Judge, *concurring in part and dissenting in part.*

I concur in that portion of the majority opinion that holds that the trial court did not err in requiring the submitted theory of liability of failure to treat to be limited to the modality of "TPN" as opposed to a broader scope of possible treatments for malnutrition. Appellant is correct in arguing that an instruction should not be required to submit evidentiary detail. Verdict directing instructions in particular, however, are dependent upon the evidence that is adduced at trial. The distinction between submitting ultimate facts but not evidentiary detail, as required by M.A.I., is often difficult to apply because the instruction must follow both the law and the evidence. In a medical negligence case, the testimony of the plaintiff's expert will

---

3. See the discussion *supra* in III(A).

largely shape the ultimate facts that must be submitted. If alternative treatments may, in the exercise of due care, be chosen by the physician, it would be improper to submit whether he was negligent only in not selecting one of the available modalities. Conversely, if the expert's testimony established that only one treatment modality would satisfy the standard of care, although there might be some evidence of some other types of treatment, then it would be a roving commission to allow the jury to find the physician negligent for not using one of the other treatment modalities. The expert witness and the plaintiff's lawyer are largely in control of this dilemma, and it must be resolved by looking at the evidence that is presented. If the expert believes that any one of several modalities would satisfy the standard of care, even though he personally might prefer one, then submission generally of all of the modalities of treatment would be proper. But this distinction between an expert's personal preference and multiple choices proper under the standard of care must be made clear. This appellant failed to do and for that reason I concur in the majority opinion on this point. Despite protestations to the contrary on appeal, the evidence clearly reveals that appellant's expert opined that, at the time in question, treatment by TPN was the only treatment that satisfied the standard of care.

I dissent, however, from that portion of the majority opinion that holds that the trial court did not err in refusing to submit appellant's theory that the respondents were negligent in failing to diagnose appellant's malnutrition. A party is generally entitled to submit any theory of recovery to the jury that falls within the scope of its pleadings, is supported by the evidence,

and is in proper form. *See Yoos v. Jewish Hosp. of St. Louis,* 645 S.W.2d 177, 191 (Mo.App.1982). The record clearly reflects that appellant's expert witness gave the opinion in proper form that respondents failed to diagnose malnutrition and that the failure fell below the standard of care. Appellant's initial proffered verdict director disjunctively submitted two prongs of negligence: (1) failure to diagnose malnutrition, or (2) failure to treat malnutrition. The objections to the failure to treat theory have been extensively discussed in the majority opinion.

The trial court apparently began discussing instructions and the verdict director with counsel just after the plaintiff's evidence ended. Such early communication and even earlier discussion is advisable. Free ranging discussions were conducted about possible theories of submission, the form of submission, and objections. Such informal instruction discussions are valuable in defining and even potentially remedying instructional problems. In this case, the "informal discussions" were done on the record and after various instructions were drafted and redrafted. The "formal instruction conference" was rather perfunctory, referring back largely to the more informal instruction conferences during the trial. As a result, the positions and objections are somewhat difficult to follow.

Nevertheless, it appears that there were two objections made to the appellant's original verdict director.[1] Respondents first objected to the submissibility of the case at all, contending that there was insufficient evidence to submit the case to the jury on any of the proffered issues. Secondly, they objected that it was improper to submit the alternative theories

---

1. There were, of course, verdict directors against each respondent. Because they were identical, they are referred to in the singular for ease of understanding.

of recovery in the disjunctive because they claimed that the evidence did not support a disjunctive submission. The trial court also indicated some concern that the initial verdict director assumed a disputed fact, *i.e.*, that appellant had malnutrition. Finally, the trial judge also indicated that it was her recollection that there was no testimony showing a causal relationship between failure to diagnose and appellant's/decedent's death.

Although it is the initial responsibility of a party to request instructions, Rule 70.02, it is ultimately the duty of the trial court to see that the jury is instructed and instructed correctly. M.A.I. 5th ed. "How to Use This Book" at p. LVII. Parties need to object to instructions before, generally, an appellate court will review an instruction for error. *Daniels v. Bd. of Curators of Lincoln Univ.*, 51 S.W.3d 1, 10–11 (Mo. App.2001). Still, the trial judge may point out flaws in an instruction, to see that the jury is not misinstructed on the law. *See Bench Book for Missouri Trial Judges, Civil Chapter 39 § 39.9 (2002)*. Where, as here, the trial judge raised two questions, herself, about the verdict director and, apparently, relied upon those concerns in making her ruling, it should be irrelevant that the respondents did not actually object to the instructions on those grounds.

The first concern expressed by the judge was whether the failure to diagnose and failure to treat submissions assumed a disputed fact. It is correct that it is improper to assume disputed facts in instructions. *Young v. Kansas City Power & Light Co.*, 773 S.W.2d 120, 125 (Mo.App. 1989). This writer does not believe the instruction was deficient in that respect. To find for the plaintiff, the jury would have to believe that respondents failed to diagnose malnutrition. There is no way that a jury could reach that finding without believing that the deceased had mal-

nutrition. How can a physician fail to diagnose a condition that does not exist? Resolution of that disputed issue of whether the decedent suffered from malnutrition was embedded in the submission offered by appellant. *Reed v. Sale Mem'l Hosp. & Clinic*, 698 S.W.2d 931, 938 (Mo. App.1985) (instruction not erroneous when a finding of the essential element is necessarily implied from the other findings required). Acceptance of respondents' novel reasoning would lead to the requirement that in a red light automobile case the submission also include whether the light was red as a separate finding before asking the jury if the defendant ran a red light.

Where evidence is conflicting, as it often is, a party is still entitled to submit its case under the theory and evidence that it has adduced. *Highfill v. Brown*, 340 S.W.2d 656, 661 (Mo. banc 1960). Accommodation of the other party's conflicting evidence is not required, with the proviso that a disputed fact cannot be ignored. The disputed fact was not ignored here. Additionally, there were other ways for respondents to even highlight the issue such as the use of a converse under M.A.I. 33.01 (*e.g.*, "Your verdict must be for defendant unless you believe that the plaintiff suffered from malnutrition"). Finally, if the failure to diagnose instruction suffered from this alleged infirmity then, likewise, the failure to treat malnutrition instruction drafted by the respondents and ultimately given by the court was incorrect for the same reason.

## WAS THERE SUBSTANTIAL CAUSATION EVIDENCE TO SUPPORT SUBMISSION OF A FAILURE TO DIAGNOSE THEORY?

The majority opinion simply concludes that it was not error to submit appellant's failure to diagnose theory because there

was no substantial evidence to satisfy the requirement of a causal relationship between the alleged act of negligence (failure to diagnose malnutrition) and the death of Shirley Mast. In attempting to justify that conclusion, the majority quotes the following testimony from appellant's expert witness:

Q: Doctor do you have an opinion within a reasonable degree of medical certainty whether the failure of Dr. Braverman to diagnose or treat the malnutrition of Shirley Mast caused her death?

A: I believe it did.

The majority unfortunately omits the immediately previous testimony of the expert as follows:

Q: Doctor ... I asked [sic] you also if you would have an opinion within a reasonable degree of medical certainty as to the cause of Shirley Mast's death. Can you give us a cause of death?

A: I think she starved to death. There were factors that happened at the last. She had an infection of the line, she had liver necrosis, she had kidney failure, all of those things, but they were triggered by starvation, malnutrition....

Nevertheless, the majority finds the testimony on causation lacking in substantial probative value because the question asked the expert whether failure to diagnose **OR** failure to treat caused Mrs. Mast's death. The reasoning used to reach this conclusion is tortured, ignores the common meaning of the words used, and is unsupported by any legal authority.

The majority seems to suggest that the word "or" means one but not the other. No reference is made to any dictionary, style manual, or other authority for that suggestion. In its customary meaning, however, "or" means "either." [2] The word "or" also usually, from a style analysis, includes "and." [3] Nevertheless, the fallacy of the majority's view of the expert's testimony is not dependent upon resolving, or even understanding, grammatical and stylistic rules.

Somehow, the majority makes a leap of logic that reinterprets the expert's testimony to be that failure to diagnose was not a cause of death but that failure to treat was. If, by use of the word "or," his testimony was not substantial evidence of causation on one theory, then how could it be so on the other? Yet the majority does not hold that by use of the word "or" that there was not sufficient causation evidence on either theory.

The majority then expands upon its fixation with the disjunctive testimony by stating "the problem with proceeding in this manner is that it is now unclear whether Dr. Schaefer believed that it was the failure to diagnose **alone,** failure to treat **alone,** or a combination of the two, which caused Mrs. Mast's death." (emphasis added). No citation is made to any legal authority that such proof is required where both alleged causes are the responsibility of the defendant.

There are, however, even more important difficulties with the majority analysis. The majority relies upon *Super v. White,* 18 S.W.3d 511 (Mo.App.2000) to support its conclusion that appellant's expert testi-

**2.** "Or" is a coordinating conjunction introducing an alternative: specifically, introducing the second of two choices. WEBSTER'S DICTIONARY OF THE ENGLISH LANGUAGE UNABRIDGED 1257 (1977).

**3.** BRYAN A. GARNER, THE ELEMENTS OF LEGAL STYLE 103 (1991). For example, a statement that a person is incapable of reading or writing connotes the inability to do both tasks, not just one.

mony on causation was not substantial evidence. In so doing it misconstrues both the holding in *Super* and ignores the actual testimony in this case. Although *Super* dealt with two possible causes of death, only one was allegedly the defendant doctor's responsibility. The decedent had preexisting cirrhosis of the liver. The doctor was charged with negligently administering a treatment to the decedent for tuberculosis in the presence of chronic Hepatitis C. The plaintiff's expert testified (because he agreed that the TB treatment did not cause the cirrhosis) that he could not testify to a reasonable degree of medical certainty that the death was caused by the TB treatment as opposed to the cirrhosis. He testified that it was both possible and not possible that the alleged negligence of the defendant caused the death. *Id.* at 517. This court properly held both that testimony of causation must be to a reasonable degree of certainty and that where there are two or more possible causes the testimony must establish to a reasonable degree of certainty that the alleged negligence caused or contributed to cause the death. *Id.* at 516–17. *See also Baker v. Guzon,* 950 S.W.2d 635, 644, 646 (Mo.App.1997). This is a far cry from the situation in this case whether there was no evidence of a possible cause of death other than the defendants' claimed negligence. Moreover, the appellant's expert, as shown from the majority opinion's own quotation from the record, testified, "to a reasonable degree of medical certainty" on the causation issue.

The majority next justifies its conclusion with the rationale that the causation testimony concerning the failure to diagnose theory was not as detailed as on the failure to treat theory. This rationale is disturbing as this writer is aware of no authority for a conclusion that one properly stated opinion of an expert lacks substantial evidentiary value because not as detailed as his testimony on another theory. The majority takes the position that Dr. Schaefer's testimony did not yield substantial evidence supporting the Plaintiff's theory of failure to diagnose because the doctor spent more time discussing the theory of failure to treat and rendered more detailed testimony concerning that theory. In this writer's view, such comparisons are irrelevant under Missouri law. To determine whether evidence is substantial, the test is merely whether it is evidence from which the trier of fact could reasonably find the issue in harmony therewith. *State v. Taylor,* 445 S.W.2d 282, 284 (Mo.1969). "A trier of facts may find an issue in harmony with certain evidence when it is not inherently incredible, self-destructive, or completely impeached by contradictory evidence, and is such that reasonable minds might believe it." *State v. Charles,* 537 S.W.2d 855, 857 (Mo.App.1976) (citing *State v. Harris,* 295 S.W.2d 94 (Mo.1956)). The doctor's testimony upon the theory of failure to diagnose more than meets that threshold.

Finally, the majority justifies its conclusion by holding that, despite what the expert said, it was ultimately the failure to treat malnutrition that really caused her death. Such weighing of the evidence is inappropriate in determining whether a submissible case has been made. Moreover, a court has no business deciding which of a party's legally supportable theories of recovery or defense is its best or real one. There was, in fact, expert testimony to support causation, and it was not proper to refuse appellant's failure to diagnose theory on that basis.

The evidence in a disjunctive submission must support each negligence prong. Respondents make no argument on appeal that the failure to treat by use of TPN theory of recovery was not supported by the evidence. As discussed above, appel-

lant's expert's testimony clearly supports an alternative theory of recovery for failure to diagnose. The only possible question that could be raised is whether the denial of that submission constituted reversible error. I believe that it did, and the cause should be reversed and remanded for a new trial.

There are many cases stating the general rule that, when considering the propriety of an instruction, the evidence is to be viewed "in the light most favorable to the submission of the instruction, and a party is **entitled** to an instruction upon any theory supported by the evidence." *Vandergriff v. Mo. Pac. R.R.*, 769 S.W.2d 99, 104 (Mo. banc 1989) (emphasis added). This principle applies equally to plaintiffs and defendants. Entitlement reflects a legal right, and a trial judge commits an abuse of discretion by refusing an instruction that is supported by the evidence and in proper form. The choice of theories to be supported by the plaintiff in a verdict director and a defendant in an affirmative defense instruction is for the party to make. The trial judge has no role in the selection of theories if those theories are supported by the evidence and are correct statements of the law. Here, I believe that the appellant submitted and offered to submit an instruction that was proper in form on the failure to diagnose theory.

It seems obvious from the instruction conference, however, that the trial judge had no intention of ever submitting a theory of failure to diagnose malnutrition as a theory of recovery, regardless of the possible wording of such a submission. In this, she erred prejudicially to the rights of the appellant. In *Williams v. Christian*, 520 S.W.2d 139 (Mo.App.1974), the issue was whether the trial court erred in refusing plaintiff's failure to keep a lookout instruction and giving instead a *res ipsa* instruc-

tion that the defendant contended was even more favorable to the plaintiff. This court said, "It is axiomatic that appellant was **entitled** to a verdict directing instruction predicated on respondent's failure to keep a careful lookout, **his theory of the case,** if supported by the evidence." *Id.* at 141 (emphasis added). After considering whether the instruction was factually supported and legally correct, Judge Sommerville stated, "Perforce, the trial court erred in refusing to give the tendered instruction." *Id.* at 146. And, finally, with regard to the prejudice issue, the court said, "If more than lip service is to be given to the principle that a party is entitled to go to the jury on his theory of the case, if supported by the evidence, then the trial court's error in refusing the requested lookout instruction cannot be sloughed off as merely harmless error." *Id.* Separately, respondent Wuellner makes an argument that the instruction was improper because he did, in fact, diagnose malnutrition, albeit at an earlier time than in question with appellant's expert. If that was his theory, he could have submitted his theory under M.A.I. 33.05. It was not a basis for refusing appellant's instruction. *See id.* at 145–46.

For the reasons stated, I dissent and would reverse and remand the cause for a new trial.