**Lester SURFACE, Plaintiff–Respondent**

v.

**Ron KELLY and Larry Thompson, Individually, and Ron Kelly, Larry Thompson, and Margie Thompson d/b/a Ozark Ostrich Farms, Defendants–Appellants.**

No. 20121.

Missouri Court of Appeals,
Southern District,
Division Two.

Nov. 8, 1995.

Motion for Rehearing or Transfer to
Supreme Court Denied Nov. 28, 1995.

Application to Transfer Denied
Jan. 23, 1996.

---

Keith D. Sorrell, Spain, Merrell & Miller, Poplar Bluff, for appellants.

James W. Riner, Hendricks & Riner, P.C., Jefferson City, for respondent.

PARRISH, Judge.

Lester Surface (plaintiff) purchased nine ostriches from Ron Kelly, Larry Thompson and Margie Thompson (defendants). Defendants conducted business under the trade name Ozark Ostrich Farms. Plaintiff brought this action contending the ostriches were not fit for a particular purpose for which they were purchased; that defendants breached an implied warranty of fitness for a particular purpose imposed by § 400.2–315.[1]

Following a jury trial, judgment was entered for plaintiff. Defendants appeal. This court finds, as a matter of law, that there was no warranty of fitness for a particular purpose. The judgment is reversed and remanded with directions.

Plaintiff became interested in the ostrich business in 1993. He contacted defendants after seeing their advertisement for the sale of ostriches in *Ratite Marketplace* magazine. Plaintiff met with Larry Thompson and Margie Thompson and expressed an interest in acquiring ostriches for resale and "to try to hatch eggs." He was interested in birds that were from two-and-a-half to four months old.

---

1. References to statutes are to RSMo 1986, unless stated otherwise.

Mr. and Mrs. Thompson took plaintiff to the Ozarks Ostrich Farms' hatchery where he met Ron Kelly. Plaintiff was shown 35 or 40 birds. Birds in one of the runs at the hatchery were of the type and age in which he was interested. Plaintiff estimated that there were probably ten birds in that run.

Plaintiff returned to the Thompson residence with Mr. and Mrs. Thompson. He told Mr. Thompson he wanted nine birds, three trios consisting of one male and two females each. Mr. Thompson completed a preprinted, one-page "sales contract" which he signed on behalf of Ozark Ostrich Farms, and plaintiff signed. The sales contract identified what plaintiff agreed to buy as:

| TYPE OSTRICH | QUANTITY | AGE | COST | TOTAL |
|---|---|---|---|---|
| A. Single Male | 3 | 3–4 mo. | 2,500.00 | 7,500.00 |
| B. Single Female | 6 | 3–4 mo. | 5,500.00 | 33,000.00 |
| C. Unrelated Pair (1 Male, 1 Female) | LESS | QUANTITY | Discount | –600.00 |
| TOTAL COST | | | | 39,900.00 |
| LESS DEPOSIT – | | | | 4,000.00 |
| AMOUNT DUE ON RECEIPT OF OSTRICHES = | | | | 35,900.00 |

The contract was dated 8–25–93. It identified plaintiff as "Buyer" and Ozark Ostrich Farms as "Seller." It stated that if delivery of the ostriches did not take place by 9–15–93, "the deposit of $4000.00 will be refunded to Buyer by Seller."

The contract did not identify the ostriches plaintiff was buying. After plaintiff returned to his home, he called Mr. Thompson to get identification numbers of the ostriches he was buying for his bank.[2]

The ostriches of the type and age plaintiff wanted to purchase were not on grass when he first saw them. The floor of the run in which they were kept was covered with material Mr. Kelly described as "tarp material used to put over dump trucks to keep the gravel from coming out when they are going down the road." The tarp material was on top of sand. The ostriches also had access to a barn with concrete floors.

Plaintiff was concerned that if the ostriches he was buying were not placed on grass before he moved them, they would not function well when he placed them on grass at his property. Mr. Kelly explained:

> [Plaintiff] was concerned that if the birds hadn't been on grass before when they got to his place they might over eat [sic] on grass because they have a tendency when they are moved and under stress to go off in a corner somewhere and eat something else besides their feed and that was what he was concerned about.

Plaintiff and his son returned to the ostrich farm about a week-and-a-half after he signed the contract to purchase the ostriches. The birds were still in the run where plaintiff first saw them. He was shown a grassy area which was being fenced and was told the ostriches would be placed there as soon as the fencing was completed. The ostriches were placed in the pen about two days later.

Plaintiff picked up the ostriches September 13, 1993. They were transported to plaintiff's property in a stock trailer and left in the trailer overnight.

The next day a veterinarian examined the birds. All nine were diagnosed as having ingested excessive amounts of rocks. One bird, ostrich No. 14, was in severe stress, dehydrated and weak. Ostrich No. 14 was taken to the University of Missouri Veterinary Clinic for emergency care. The bird died that evening. Defendants later provided plaintiff a replacement bird for the one that died.

2. Ozark Ostrich Farms placed leg bands with identification numbers on the birds.

Another bird, ostrich No. 19, was operated on about two weeks later to remove rocks from its stomach and gizzard because it had not been eating. The veterinarian who first inspected the birds performed another inspection in May 1994. His opinion was that the birds' sizes were stunted. He was unable to evaluate whether the birds' breeding abilities were affected. That determination could not be made until they were older.

Defendants present five points on appeal. Four assert trial court error in not directing a verdict for defendants for various reasons. One contends the trial court erred with respect to an evidentiary ruling and one argues the trial court erred in not granting remittitur as to the amount of damages assessed by the jury. Point IV is dispositive of the appeal.

Point IV contends the trial court erred in not granting defendants' motion for a directed verdict at the close of all the evidence because the goods sold, the ostriches, were livestock and "sellers of livestock are not liable for breaches of the implied warranty of fitness for a particular purpose unless such a warranty is in writing."

Section 400.2–315 states:

Where the seller at the time of contracting has reason to know any particular purpose for which the goods are required and that the buyer is relying on the seller's skill or judgment to select or furnish suitable goods there is unless excluded or modified under section 400.2–316 an implied warranty that the goods shall be fit for such purpose.

Section 400.2–316(5) states:

A seller is not liable for damages resulting from the lack of merchantability or fitness for a particular purpose of livestock he sells if the contract for the sale of the livestock does not contain a written statement as to a warranty of merchantability

or fitness for a particular purpose of livestock.

And, consistently, § 277.141 provides:

If a contract for the sale of livestock does not contain a written statement as to a warranty of merchantability or fitness for a particular purpose, the seller is not liable for damages resulting from the lack of merchantability or fitness for a particular purpose of the livestock sold under the terms of that contract.

It is questionable that plaintiff's statement to defendants that he wanted to buy four-month-old ostriches to raise for resale and to hatch eggs stated a particular purpose for which § 400.2–315 imposed an implied warranty of fitness. Arguably, this would be an ordinary use rather than a particular purpose for which the ostriches were being acquired.[3] However, for the reasons that follow, this court need not, and does not, determine whether the representation plaintiff made to defendants constituted a statement of a particular purpose for which he was acquiring the ostriches.

The critical issue in this appeal is whether the ostriches were livestock. In order for sales of livestock to be subject to implied warranties of merchantability or fitness, the applicable contract for sale must contain a written statement of the warranties. §§ 400.2–316 and 277.141. The contract for sale in this case contains no such statement.

Plaintiff contends that the applicable definition of livestock is found in § 277.020(1), RSMo Supp.1992. It defines livestock as "cattle, swine, sheep, goats and poultry, equine and exotic animals." This statute was in effect the date the contract was signed—August 25, 1993. However, on August 28, 1993, the definition changed. Effective that date, the definition of livestock became "cattle, swine, sheep, ratite birds including but not limited to ostrich and emu, goats and poultry, equine and exotic animals." § 277.020(1), RSMo Supp.1993.[4]

---

3. "A 'particular purpose' differs from the ordinary purpose for which the goods are used in that it envisages a specific use by the buyer which is peculiar to the nature of his business whereas the ordinary purposes for which goods are used are those envisaged in the concept of merchantability and go to uses which are cus-

tomarily made of the goods in question." Mo. Ann.Stat. § 400.2–315 comment 2 (Vernon 1965).

4. The statute was amended to specifically include "ratite birds including but not limited to ostrich and emu" in the definition of "livestock." *See*

Plaintiff argues that because the statutory definition in effect the date the contract was signed did not specifically list ostriches among the species it identified as "livestock," they were not considered as such. He concludes, therefore, that the requirement imposed by § 400.2–316(5) for a contract for the sale of livestock to contain a written statement in order to establish a warranty of merchantability or fitness for a particular purpose does not apply.

Plaintiff's argument is based on the principle that in construing statutes, the legislature is not to be deemed to have done meaningless acts. *See City of Willow Springs v. Missouri State Librarian,* 596 S.W.2d 441, 444 (Mo. banc 1980); *Bennett v. Director of Revenue,* 889 S.W.2d 166, 169 (Mo.App.1994); *Wolfner v. Board of Adjustment of City of Frontenac,* 672 S.W.2d 147, 151 (Mo.App. 1984). He contends that the legislature's 1993 amendment of § 277.020(1), RSMo Supp.1992, so that the amended statute specifically included "ratite birds including but not limited to ostrich and emu" in the definition of "livestock" was an acknowledgment that ostriches were not "livestock" under the previous definition.

Defendants contend, in their argument in support of Point IV, that ostriches were included in the statutory definition of livestock that was in effect at the time the contract was signed. Defendants argue that the definition included ostriches because they are "exotic animals." They cite a dictionary definition of "exotic" as "of foreign origin" or "introduced from abroad."

The principle of statutory construction that the legislature is not deemed to have done a meaningless act is sound. However, other principles of statutory construction are equally apropos to the facts in this case. Courts, in interpreting a particular statute, properly consider other statutes involving similar or related subject matter. *Angoff v. M & M Management Corp.,* 897 S.W.2d 649, 654 (Mo.App.1995). " 'All consis-

tent statutes relating to the same subject are in pari materia and are construed together as though constituting one act, whether adopted at different dates or separated by long or short intervals.' " *Id., quoting State ex rel. Rothermich v. Gallagher,* 816 S.W.2d 194, 200 (Mo. banc 1991). Furthermore, it is presumed that the legislature, in enacting a statute, intended a logical result; that it did not intend an unreasonable one. *Angoff, supra.*

The 1993 amendment to § 277.020(1), RSMo Supp.1992, was not the only bill relating to ostriches that was passed during the 1993 legislative session. The General Assembly passed H.C.S.S.B. 84, 1993 Mo.Laws. Section 13 of that bill provides, "For the purposes of any rule or regulation promulgated by any department, board, or commission of this state, the ratite birds including but not limited to emu and ostrich scientifically designated as Dromiceius novae-hollandiae, shall be treated and classified as livestock rather than as an exotic animal." [5] That bill was codified as § 277.022, RSMo Supp.1993.

Sections 277.022 and 277.020(1) relate to the same subject, classification of ratite birds for purposes of the laws of this state. They are in *pari materia* and, therefore, subject to being construed together as though constituting one act. Section 277.022, RSMo Supp. 1993, specifies that ratite birds, including ostrich and emu, "shall be treated and classified as livestock **rather than as exotic animals.**" (Emphasis added.) This court infers, from the inclusion of the words "rather than as exotic animals," that ratite birds were theretofore considered exotic animals. Otherwise the words would be superfluous and would add nothing to the words that precede them.

Believing that the legislature intended a logical result in its enactment of § 277.022, RSMo Supp.1993, and construing §§ 277.020(1) and 277.022, RSMo Supp.1993, together as though being a part of a single

C.C.S.S.C.S.H.C.S.H.B. 566. The effective date of the amendment was August 28, 1993.

**5.** In its codification as § 277.022, the reference in H.C.S.S.B. 84 to "emu and ostrich" was re-

versed. In § 277.022, the statement appears as "ostrich and emu" consistent with the order in which the terms appear in § 277.020(1).

act, this court concludes that prior to the 1993 amendment of § 277.020(1), RSMo Supp.1992, the term "exotic animals," as used in that statute, included ostrich.

■ Regardless of whether the 1992 revision or the 1993 revision of § 277.020(1) applies, the contract was for the sale of livestock. It did not contain a written statement as to any warranty of merchantability or fitness for a particular purpose. Therefore, there was no such implied warranty. §§ 400.2–315 and 400.2–316(5).

Defendants' Point IV is granted. The trial court erred in denying defendants' motion for directed verdict at the close of the evidence. The judgment is reversed. The case is remanded. The trial court is directed to enter judgment for defendants.

SHRUM, C.J., and CROW, J., concur.