**HOWARD CONSTRUCTION COMPANY, Appellant,**

v.

**BENTLEY TRUCKING, INC., Respondent.**

**No. WD 64848.**

Missouri Court of Appeals, Western District.

March 28, 2006.

Scott Henry Murphy, Kansas City, MO, for appellant.

Gerard H. Donovan, Kansas City, MO, for respondent.

Before HARDWICK, P.J., BRECKENRIDGE and SPINDEN, JJ.

PATRICIA BRECKENRIDGE, Judge.

Howard Construction Company appeals the trial court's denial of its motion for a new trial following a jury verdict against it on its claim for breach of contract against Bentley Trucking and in favor of Bentley on Bentley's counterclaim for action on account. Howard raises two points on appeal. In its first point, Howard claims the trial court erred in refusing to submit its proposed jury instruction on breach of the implied warranty of fitness for a particular purpose. In its second point, Howard asserts the trial court erred in denying its motion for a new trial because the jury's verdict in favor of Bentley on its breach of contract claim and in favor of Bentley on Bentley's counterclaim "were so shocking and grossly inadequate that they could have only resulted from passion and prejudice on the part of the jury." Finding no error, the trial court's judgment is affirmed.

## Factual and Procedural Background

In November 1998, Howard Construction Company submitted a bid to the Missouri Department of Transportation (MoDOT) for a Highway 36 reconstruction project in Livingston County. In making its bid for the project, Howard solicited bids from subcontractors and suppliers. Bentley Trucking provided a bid to Howard, in part, to furnish and deliver 34,000 tons of concrete sand at a price of $7.48 per ton. Howard incorporated Bentley's bid into its bid to MoDOT for the Highway 36 project. MoDOT ultimately awarded the project to Howard. Thereafter, on November 17, 1998, Howard and Bentley entered into a subcontract, in part, for Bentley to furnish and deliver concrete sand for the Highway 36 project. Under Howard's contract with MoDOT, which was incorporated into the subcontract with Bentley, MoDOT specified the specific type of concrete sand to be used on the project.

In January 2000, Howard located a project site and began to set up the site. Shortly after setting up the site, Bentley began delivering concrete sand to the project site.[1] Bentley obtained the concrete

---

1. In April 2000, Howard began the actual  concrete paving phase of the project.

sand it furnished and delivered to Howard from Capital Sand in Jefferson City. MoDOT inspectors were on site at Capital Sand and inspected the sand before it was loaded into Bentley's dump trucks. MoDOT inspectors inspected the sand for contaminants, including mud.

On April 6, 2000, Joe Clancy, the concrete plant foreman for Howard, rejected a load of concrete sand delivered to the project site by Bentley. On the delivery ticket, Mr. Clancy wrote "Turned Down Mud." The next day, John Howard, Vice President of Howard, wrote a letter to Bentley noting that it was having problems with Bentley's sand because there was "visible mud in the sand being delivered." Mr. Howard informed Bentley that he expected Bentley to rectify the problem immediately and that if, at any time, any of the sand should be rejected due to mud or other debris, Howard would hold Bentley responsible for all costs involved in ensuring that the sand was in compliance. On June 16, 2000, Howard faxed Bentley correspondence, which stated, "The sand stockpile is near rejection because of mud contamination as was referenced to in this included correspondence, please give it your immediate attention."

On July 20, 2000, Howard rejected another load of concrete sand delivered by Bentley. The delivery ticket in this case stated "Don't Pay Mud In It." On September 9, 2000, Howard rejected two additional loads of sand delivered by Bentley. Each of the delivery tickets associated with these rejected loads indicated that the loads were rejected because the sand had mud in it. In total, Howard rejected four loads out of approximately 1800 loads of concrete sand delivered by Bentley.

Howard completed the Highway 36 project in October 2000. By October 18, 2000, MoDOT inspectors had discovered problems with the pavement. In particular,

James Gillespie, MoDOT resident engineer for the project, stated that the sand used to make the concrete had been contaminated by some source and that the contamination caused "mud balls" in the pavement. Bentley agreed that it would repair the holes to the pavement caused by the mud balls. In November 2000, Jason Riddle, who was employed by Bentley at the time, repaired thirty-six holes in the pavement. In making the repairs, MoDOT employees walked ahead of Mr. Riddle and circled areas that were in need of repair with orange or pink paint. Mr. Riddle would follow behind and dig out the contaminated material, blow the area with an air compressor, and then fill the hole with MoDOT-approved epoxy.

In January 2001, Bill McClendon, construction manager for Howard, sent Bentley a letter informing Bentley that MoDOT was undertaking an "in-depth review of the 'mud ball' presence caused by the contaminated sand in the concrete pavement" on the Highway 36 project. On February 6, 2001, MoDOT sent a letter to Howard informing it of "pending deductions related to mud balls found in the pavement" of the Highway 36 project. The letter further stated, "a minimum deduction of 20 percent of the contract unit price will be made for the areas affected." Sometime thereafter, between March and May 2001, Mr. Riddle, on behalf of Bentley, repaired approximately an additional 1000 holes in the pavement by filling them with epoxy. Mr. Riddle stated that about six to seven percent of the holes that he repaired had mud in them and maybe only a dozen of those holes contained mud that was mixed in with sand.

In October 2001, MoDOT informed Howard of the payment deduction for marred surface on the Highway 36 project. Specifically, MoDOT reduced Howard's payment by $221,643.51. After receiving

the amount of the payment deduction from MoDOT, Howard sent Bentley an invoice for the entire amount of the deduction. The invoice explained that the amount due was for "[m]arred surface deduction on 300MM Concrete Pavement due to mud balls in concrete sand." On October 27, 2001, Howard sent a fax to Bentley requesting that Bentley advise Howard of how it intended to handle the "marred surface" situation. On November 9, 2001, Howard sent another invoice to Bentley in the amount of $221,643.51, plus an additional amount of $3,324.65 representing interest for the time period from October 10, 2001, to November 9, 2001.

On January 14, 2002, following Bentley's refusal to accept liability for the "marred surface" deduction, Howard filed a three-count petition against Bentley. In Count I, Howard alleged that Bentley breached its subcontract with Howard by failing to furnish concrete sand that was of a "suitable character and quality for the purpose intended, and that was free from contamination." Howard sought damages in the amount of $224,968.16, the MoDOT deduction, plus interest. In Count II, Howard alleged that Bentley breached the implied warranties of merchantability and fitness for a particular purpose, under sections 400.2–314 and 400.2–315, RSMo 2000, respectively.[2] In Count III, Howard alleged that Bentley's negligence in performing its obligations under the subcontract caused Howard's damages in the amount of $224,968.16.

On March 25, 2002, Bentley filed an answer and a counterclaim for an action on account. In its counterclaim, Bentley sought an amount of $32,937.71 due and owing under its subcontract with Howard. Of the entire amount, $20,376.81 was for

concrete sand furnished and delivered to the Highway 36 project site, and $12,560.90 was for excavation and installation of concrete pipe.

In August 2004, a jury trial was held on Howard's petition and Bentley's counterclaim. After four days of testimony, both parties rested. On the fifth day, the parties met with the trial judge, outside the presence of the jury, to discuss jury instructions. Howard offered a proposed jury instruction on breach of the implied warranty of fitness for a particular purpose. In response, Bentley argued that Howard failed to present any evidence that it relied on Bentley's expertise, skill, or knowledge, and that when a buyer makes an independent examination of the product and tests the product to determine its fitness for its intended use, there can be no implied warranty of fitness for a particular purpose. The trial court agreed with Bentley and refused to submit Howard's jury instruction on breach of the implied warranty of fitness for a particular purpose to the jury. Ultimately, the trial court submitted two claims to the jury: Howard's claim for breach of contract, and Bentley's counterclaim for money due on an account.

On Howard's claim for breach of contract, the jury found in favor of Bentley. On Bentley's counterclaim for money due on account, the jury also found in favor of Bentley and awarded Bentley damages in the amount of $20,376.81.[3] Thereafter, the trial court entered judgment in accordance with the jury's verdict. On September 27, 2004, Howard filed a motion for a new trial claiming the trial court erred in refusing to submit its jury instruction for breach of the implied warranty of fitness for a par-

2. All statutory references are to the Revised Statutes of Missouri 2000.

3. Prior to trial, Howard paid the additional amount allegedly owed to Bentley for excavation and installation of concrete pipe.

ticular purpose to the jury. Howard also asserted that the jury's verdict was against the weight of the evidence. Following a hearing on Howard's motion, the trial court denied the motion. Howard filed this appeal.

### No Error in Failing to Submit Jury Instruction

In its first point on appeal, Howard asserts the trial court erred in refusing to submit its proposed jury instruction on its claim for breach of the implied warranty of fitness for a particular purpose. Specifically, Howard claims that its evidence established a submissible case on a claim for breach of the implied warranty of fitness for a particular purpose because the evidence demonstrated each of the required elements for stating such a claim.

This court reviews a trial court's refusal to submit an instruction to the jury for an abuse of discretion. *Mast v. Surgical Servs. of Sedalia, L.L.C.*, 107 S.W.3d 360, 365 (Mo.App. W.D.2003). "In considering the propriety of a proffered instruction, [this court] view[s] the evidence in the light most favorable to the submission of the instruction, keeping in mind that a party is entitled to an instruction on any theory supported by the evidence." *Id.* A jury instruction, however, "must be supported by substantial evidence." *Id.* "If the evidence does not support each allegation presented in the instruction, the giving of the instruction is error." *Id.* On the other hand, the error in refusing to give an instruction is reversible error only if it was prejudicial to the complaining party. *Id.*

Section 400.2–315 sets forth the requirements for a claim for breach of the implied warranty of fitness for a particular purpose. Specifically, a claim exists under section 400.2–315:

> Where the seller at the time of contracting has reason to know any particular purpose for which the goods are required and that the buyer is relying on the seller's skill or judgment to select or furnish suitable goods there is unless excluded or modified under section 400.2–316 an implied warranty that the goods shall be fit for such purpose.

Comment 2 to section 400.2–315 explains that a " 'particular purpose' differs from the ordinary purpose for which the goods are used in that it envisages a specific use by the buyer which is peculiar to the nature of his business."[4] In contrast, Comment 2 explains that an ordinary purpose "for which goods are used are those envisaged in the concept of merchantability and go to uses which are customarily made of the goods in question." *See also Ingram River Equip., Inc. v. Pott Indus., Inc.*, 816 F.2d 1231, 1233–34 (8th Cir.1987) ("the key inquiry is not whether anyone else can be found who puts the goods to the same use, but whether the buyer's use is sufficiently different from the customary use of the goods to make it not an ordinary use of the good"); *State ex rel. Jones Store Co. v. Shain*, 352 Mo. 630, 179 S.W.2d 19, 21 (banc 1944) (defining "particular purpose" under the common law implied warranty of fitness for a particular purpose as "a special purpose as distinguished from the ordinary use of the article in question").[5]

---

4. UCC comments are a permissible and persuasive aid in determining legislative intent, even though they do not constitute binding authority. *Bracey v. Monsanto Co.*, 823 S.W.2d 946, 950 n. 6 (Mo. banc 1992) (citing

*Groppel Co. v. U.S. Gypsum Co.*, 616 S.W.2d 49, 57 n. 7 (Mo.App. E.D.1981)).

5. Prior case law addressing a common law cause of action for breach of an implied warranty give guidance because, as the Missouri

Bentley argues that Howard failed to state a claim for breach of the implied warranty of fitness for a particular purpose because Howard failed to demonstrate that Howard intended to use the concrete sand Bentley provided for anything but its ordinary purpose. In particular, Bentley contends that the ordinary purpose for concrete sand is to make concrete.

Here, Howard contracted with Bentley for Bentley to furnish and deliver *concrete* sand. The evidence in the record was that Howard intended to use, and did in fact use, the concrete sand Bentley provided to it to make concrete for the Highway 36 paving project. While Comment 1 to section 400.2–315 does state that whether an implied warranty of fitness for a particular purpose "arises in any individual case is basically a question of fact," there must still be sufficient evidence presented to create a question of fact. In this case, there is no evidence that Howard intended to use the concrete sand for any particular purpose outside the ordinary use of concrete sand, that is, to make concrete. In fact, Larry Howard, president of Howard Construction, testified as to the process of making concrete and listed the ordinary ingredients of concrete as "fly ash, stone, *sand,* and water." (Emphasis added). Moreover, R. Wayne Cunningham, who operates Missouri Mobile Concrete, testified that in the course of his business, that is, making concrete, he uses sand "[a]ll the time." This court agrees with Bentley that an ordinary use of concrete sand is to make concrete. Accordingly, because Howard used the concrete sand provided by Bentley for its ordinary purpose of making concrete, Howard failed to demonstrate that it intended to use the concrete sand for a "particular purpose" different from concrete sand's ordinary purpose. *See Surface v. Kelly,* 912 S.W.2d 646, 649 (Mo.App. S.D.1995) (suggesting that it was questionable whether the plaintiff's statement to the defendant that he wanted to buy four-month-old ostriches to raise for resale and to hatch eggs stated a particular purpose giving rise to implied warranty of fitness for particular purpose under section 400.2–315 because such a use would be ordinary rather than particular purpose for which the ostriches were being acquired). Consequently, there can be no implied warranty of fitness for a particular purpose and the trial court did not err in failing to submit Howard's proposed instruction to the jury.

Nevertheless, while Howard does not argue that it intended to use the concrete sand provided by Bentley for a "particular purpose," i.e., a purpose outside the ordinary, in its reply brief, Howard does argue that Bentley failed to preserve this issue for appeal. In the cases relied on by Howard, however, it is the *appellant* that failed to properly preserve the issue regarding the challenged jury instruction for appeal. *See Gill Constr., Inc. v. 18th & Vine Auth.,* 157 S.W.3d 699, 718 (Mo.App. W.D.2005); *Zakibe v. Ahrens & McCarron, Inc.,* 28 S.W.3d 373, 378 (Mo.App. E.D.2000). Bentley, however, is not the party claiming that the trial court erred in failing to submit the proposed jury instruction. Rather, Howard is the party claim-

Supreme Court recognized in *Smith v. Old Warson Dev. Co.,* 479 S.W.2d 795, 798 (Mo. banc 1972), "implied warranties of merchantable quality and reasonable fitness for use are derived from the common law." *See also O'Dell v. Custom Builders Corp.,* 560 S.W.2d 862, 870 (Mo. banc 1978) (discussing that implied warranty of merchantability under section 400.2–314 was derived from warranty that existed at common law); Section 400.1–103 (unless displaced by particular provision of UCC, "principles of law and equity" supplement Code provisions).

844

ing that the trial court erred in failing to submit its proposed instruction. If the trial court had actually submitted Howard's proposed jury instruction and Bentley had sought to challenge the trial court's submission on appeal, then Bentley would be limited on appeal to the arguments it raised at the trial court level. This is not the situation before this court, however. Rather, Howard, not Bentley, is the party claiming the trial court erred. It is the party claiming error that must preserve the issue for appeal. In this case, that party is Howard, not Bentley.

■ In addition, this court can affirm the trial court's judgment on any basis supported by the record. *Scott v. Scott*, 147 S.W.3d 887, 895 (Mo.App. W.D.2004). Howard was only entitled to the proposed jury instruction if the evidence supported giving the instruction. *Mast*, 107 S.W.3d at 365. Here, Howard failed to demonstrate that it intended to use the concrete sand provided by Bentley for anything other than its ordinary purpose, that is, to make concrete. Consequently, the evidence did not support giving the proposed jury instruction and the trial court did not err in failing to submit the instruction to the jury.

Howard's first point is denied.

### No Error in Failing to Grant Motion for New Trial

In its second point on appeal, Howard contends the trial court erred in failing to grant its motion for a new trial because the jury's verdict against it on its breach of contract claim and in favor of Bentley on Bentley's counterclaim "were so shocking and grossly inadequate that they could have only resulted from passion and prejudice on the part of the jury." Howard asserts that the jury's verdict was clearly wrong because it proved that (1) a valid contract existed between Howard and Bentley; (2) under the contract, Bentley had an obligation to provide concrete sand meeting MoDOT specifications; (3) Bentley breached the contract; and (4) it suffered damages as a result of the breach. Moreover, Howard argues that Bentley even conceded many of the elements required to establish its claim. In particular, Howard argues that Bentley conceded there was a valid contract and it was obligated to provide Howard with concrete sand meeting MoDOT specifications. In addition, Howard argues that Bentley admitted that it delivered contaminated concrete sand to Howard in clear breach of MoDOT's specifications.

■ This court reviews a denial of a motion for a new trial for an abuse of discretion. *Warren Davis Props. V, L.L.C. v. United Fire & Cas. Co.*, 111 S.W.3d 515, 520 (Mo.App. S.D.2003). In reviewing the trial court's ruling, this court reviews the evidence in the light most favorable to the jury's verdict. *Id.* "The jury's verdict will not be disturbed unless there is a complete absence of probative facts to support it." *Id.* at 521. Thus, this court is "limited to a determination of whether substantial evidence exists to support the jury's verdict." *Id.* This court will not reverse a jury's verdict unless the verdict is " 'so shocking and grossly inadequate that it could have only resulted from passion and prejudice on the part of the jury.' " *Id.* (citation omitted).

■ Howard correctly notes that a breach of contract claim requires proof of "(1) the existence of a valid contract; (2) the rights and obligations of the respective parties; (3) a breach; and (4) damages." *Id.* In addition, this court agrees that Bentley conceded the first two elements, that is, that a valid contract existed between Howard and Bentley, and under the terms of the contract, Bentley was obligat-

ed to furnish and deliver to Howard 34,000 tons of concrete sand meeting MoDOT specifications.

■ Regarding the third element, Howard argues the evidence established that Bentley provided concrete sand to Howard that was contaminated with mud. This court agrees that the evidence did demonstrate that Howard rejected four truckloads of sand Bentley delivered because of mud contamination. Nevertheless, the jury also heard evidence that Bentley delivered a total of 1800 truckloads of concrete sand. Thus, of the entire amount delivered to Howard from Bentley, only 0.2% of the total truckloads of concrete sand delivered by Bentley were actually rejected by Howard due to mud contamination. Viewed in this light, the jury's verdict that Bentley did not breach the contract with Howard is not so shocking as to indicate that it was the result of passion and prejudice on the part of the jury. *Id.*

In addition, Howard argues that Bentley conceded that it failed to provide concrete sand suitable for use in making concrete pavement and that met MoDOT specifications. None of the three citations to the record provided by Howard, however, support its argument that Bentley conceded that the sand it provided to Howard did not meet MoDOT specifications. In the first two citations to the record relied on by Howard, Mr. Bentley simply agrees that Bentley agreed to furnish and haul concrete sand meeting MoDOT specifications. In the final citation to the record relied on by Howard, Mr. Bentley agreed that four loads of sand delivered by Bentley were rejected by Howard because it had mud in it. Howard simply points to no concession by Bentley that the sand it

delivered to Howard did not meet MoDOT specifications. In fact, several MoDOT employees actually testified to the contrary.

For example, Mr. Gillespie, the MoDOT resident engineer for the Highway 36 project, testified that the sand was inspected and tested at Capital Sand by three different people before it was delivered to Howard and no contaminants were found. Robert Hughson, a construction inspector with MoDOT also testified that the concrete sand delivered by Bentley passed a gradation test and that no tests indicated that the sand had contaminants. Mr. Hughson further testified that the sand used on the project met MoDOT specifications. Likewise, Charles Langewisch, MoDOT plant inspector for the Highway 36 project, testified that he never noticed any mud in the sand. Finally, Darren Condron, MoDOT project manager for the Highway 36 project, testified that the sand provided by Bentley met MoDOT specifications and he would not have let the sand go into the concrete if it had contained mud. In light of the testimony from actual MoDOT employees that the concrete sand Bentley delivered to Howard met with MoDOT specifications, this court finds sufficient evidence to support the jury's verdict that Bentley did not breach its contract with Howard by delivering concrete sand to Howard that did not meet MoDOT specifications and that was contaminated with mud.[6]

Finally, regarding the element of damages, Howard argues that proof that it was damaged is found in the over 2000 mud balls found in the concrete pavement and the MoDOT twenty percent reduction in its contract price. While this court agrees

6. In addition, Russell O'Laughlin, who also was a subcontractor on the Highway 36 project and has been in the ready-mix concrete business for over thirty years, testified that the concrete sand he observed at Howard's worksite, which was furnished by Bentley, would have passed MoDOT specifications.

that Howard did demonstrate that it suffered a twenty percent deduction in its contract price with MoDOT as a result of over 2000 mud balls in the concrete pavement, this court finds sufficient evidence to support the jury's verdict that Howard's damages were not actually caused by Bentley's failure to satisfy its obligations to Howard. In fact, the record contains overwhelming evidence to the contrary.

First, it is clear from the evidence that the four loads of concrete sand rejected for mud contamination were not used to make the concrete. Rather, the loads were rejected and never delivered to the sand stockpile. Mr. Howard testified that Howard would not use contaminated sand and that if Howard thought there was mud in the sand, it would not have used the sand to make its concrete. Mr. Clancy, concrete plant foreman on the project, testified that when mud was discovered in the sand, he would have workers climb up on the sand pile and remove the mud. To the best of his ability, Mr. Clancy said that he kept mud out of the sand that he used to make the concrete for the Highway 36 project. Moreover, Mr. Clancy admitted that he did not think the mud problem was sufficient to warrant screening the sand before using it to make concrete. Even more telling is the testimony of Mr. Boles. Mr. Boles testified that he was the "sand pusher" on the project and that it was his job to observe the sand going up a conveyor belt before it went into the "hopper" to make the concrete. Mr. Boles testified that none of the sand he observed going into the hopper had mud it in. Mr. Boles further testified that all of the sand that went up the conveyor and was used to make concrete on this project was "clean sand."

Finally, the record contains evidence indicating that mud could have been introduced into the sand or concrete process at stages after Bentley delivered the sand to Howard. In particular, Mr. Condron testified that the mud contamination could have come from many origins. For example, Mr. Gillespie testified that he believed that the concrete mix might have been contaminated while it was handled on the project, for example, by dirty equipment. Jerry Sizemore, who hauled sand to Howard on behalf of Bentley, testified that he believed that mud was incorporated into the sand by Howard's bulldozer because the sand pile got so large that it crept over the edge of its concrete base into muddy ground. Similarly, Kenneth Ripley, a Bentley employee who hauled sand to Howard's site, testified that the sand pile got too large for its base. Scott Riddle, who worked for Howard on the Highway 36 project pouring concrete, testified that he noticed mud going into the concrete as it was being poured. This court finds this evidence sufficient to support the jury's verdict that Howard's damages were not caused by Bentley's failure to provide concrete sand that met MoDOT specifications and was free of mud contamination.

In sum, while Howard did establish the existence of a valid contract and that, under the terms of the contract, Bentley was to provide it with concrete sand meeting MoDOT specifications, this court finds sufficient evidence to support the jury's verdict that Bentley did not breach the contract or that Howard's damages were not caused by Bentley's actions.[7] Accordingly,

---

**7.** While Howard argues in its point relied on that the trial court erred in failing to grant a new trial on Bentley's counterclaim for action on account, Howard's argument is devoted exclusively to its claim for breach of contract.

"[E]rrors raised in the points relied on, which are not supported by argument, are deemed abandoned and present nothing for appellate review." *Eagle ex rel. Estate of Eagle v. Redmond,* 80 S.W.3d 920, 924 (Mo.App. W.D.

the jury's verdict is not so shocking as to have only resulted from passion and prejudice on the part of the jury. *Warren Davis Props.*, 111 S.W.3d at 521. Consequently, the trial court did not abuse its discretion in failing to grant Howard's motion for a new trial. Howard's second point is denied.

The trial court's judgment is affirmed.

All concur.

2002). Therefore, because Howard failed to develop an argument regarding Bentley's counterclaim, this court deems the claim abandoned.